IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SOUTHWEST ORGANIZING PROJECT;
NEW MEXICO VOICES FOR CHILDREN;
SENATOR MIMI STEWART; SENATOR
ANTONETTE SEDILLO LOPEZ;
REPRESENTATIVE ANDRES ROMERO;
LUCILLE CORDOVA; REYNALUZ JAREZ
and DANTE SMITH,

      Plaintiffs,

vs.                                     No. CIV 20-0098 JB/JFR

UNITED STATES DEPARTMENT OF THE
AIR FORCE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: the Defendants' Motion to Dismiss and Memorandum in Support, filed April 20, 2020 (Doc. 13)(" MTD"). The Court held a hearing on July 21, 2020. See Clerk's Minutes at 1, filed July 21, 2020 (Doc. 36). The primary issues are: (i) whether the Court should dismiss the Plaintiffs' Complaint, filed February 3, 2020 (Doc. 1)("Complaint"), for a lack of subject-matter jurisdiction, because the Plaintiffs' imminent-and-substantial-endangerment claim under the Resource Conservation and Recovery Act's ("RCRA") § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), is an impermissible collateral attack on the Permit that the New Mexico Environment Department ("NM Environment Department") issued to the Defendant United States Air Force ("Air Force"); and, (ii) whether the Court should dismiss the Plaintiffs' Complaint pursuant to the primary jurisdiction doctrine, and, thus, defer to the NM Environment Department's regulatory oversight of the case  The Court concludes that: (i) it lacks subject-matter jurisdiction over the Plaintiffs' Complaint, because the Plaintiffs' imminent-and

substantial-endangerment claim under the RCRA, § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), is an impermissible collateral attack on the Permit that the NM Environment Department issued to the Air Force to address the imminent solid wastes or hazardous wastes resulting from the Kirtland Air Force Base's ("Kirtland AFB") leaking and spilling of petroleum-based fuels that was discovered in 1999; and (ii) even if it had subject-matter jurisdiction, it should defer to the NM Environment Department's regulatory authority in overseeing the Air Force's corrective actions related to the leak, and, therefore, dismiss the Plaintiffs' Complaint pursuant to the primary jurisdiction doctrine, because, under the Tenth Circuit's primary jurisdiction factors, (i) the case's factual issues fall within the NM Environment Department's expertise; (ii) the Air Force could be subjected to conflicting orders by the Court and the NM Environment Department; (iii) the Air Force and the NM Environment Department have already initiated corrective efforts; (iv) the NM Environment Department has monitored diligently the Air Force's efforts pursuant to the Permit; and (v) the Plaintiffs' requested injunctive relief requires scientific or technical expertise. Accordingly, the Court grants the Air Force's MTD and dismisses the case.

## FINDINGS OF FACT

The Court takes its facts from the Plaintiffs' Complaint and the Air Force's MTD. See Complaint ¶¶ 1-40, at 1-13; MTD at 1-2, 4-6.

1.   This matter arises from claims for injunctive relief to abate and mitigate endangerment under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 - 6992 (1976)("RCRA"), which the Plaintiffs Southwest Organizing Project ("SWOP"); New Mexico Voices for Children; New Mexico Senator Mimi Stewart; New Mexico Senator Antoinette Sedillo Lopez; New Mexico Representative G. Andrés Romero; New Mexico resident Lucille Cordova; New Mexico resident Reynaluz Juarez; and New Mexico resident Dante Smith ("Plaintiffs"), bring

against the Air Force,  a service of the United States Department of Defense ("DOD"), and a United States agency or department.  See Complaint ¶ 1, at 1.

2.      Since approximately 1951, the Air Force has "operated a bulk fuel facility in the western portion of Kirtland Air Force Base," which has consisted of "above-ground storage tanks, a fuel loading rack, a pump house, and associate pipes and valves."  Complaint ¶  15, at 6.

3.      "Through its history, the bulk fuel facility has been used to store aviation gasoline, jet propellant grade 4 (JP-4), jet propellant grade 8 (JP-8), gasoline and diesel fuel."  Complaint ¶ 15, at 6.

4.      Although  the Air Force discontinued aviation gasoline storage  and JP-4 storage in 1975 and 1993, respectively, the Air Force continues through the present to store "JP-8, gasoline, and diesel fuel" at Kirtland Air Force Base ("Kirtland AFB").  Complaint ¶  15, at 6.

5.      In November, 1999, Kirtland AFB personnel first "discovered that the bulk fuels facility was leaking from an underground fuel line," and, in total, "an estimated 5 million to 24 million gallons of petroleum-based fuels leaked from the facility and entered soil and groundwater at Kirtland Airforce Base."  Complaint ¶ 16, at 7.

6.      Since the November, 1999, discovery of the Kirtland AFB leak, the Air Force has been addressing the fuel leak contamination.  See Complaint ¶ 38-39, at 12-13; MTD at 4.  See also Phase 1 RCRA Facility Investigation Report ¶ 1, at 2, filed April 20, 2020 (Doc. 13-1)("RCRA Facility Investigation Report").

7.      The NM Environment Department is the New Mexico state regulatory agency that has been, and is currently responsible for, ensuring that the Air Force's corrective actions are implemented in a manner protective of human health and the environment.  See Complaint, ¶ 29, at 12-13; MTD at 3-4.

8.      In July, 2010, following the NM Environment Department's issuance of a draft Permit, and following public comment periods in 2007 and 2010, which offered the public an opportunity to comment on the draft Permit and an opportunity for public hearing, the NM Environment Department issued the Air Force's Hazardous Waste Treatment Facility Operating Permit, Environmental Protection Agency ("EPA") Identification ("ID") Number ("No,") NM95570024423 for Kirtland AFB at 1, filed April 20, 2020 (Doc. 13-2)("Permit").  See MTD at 5.

9.      The NM Environment Department regulates the Air Force's ongoing response in accordance with the Permit's corrective action requirements.  See Permit at 1; MTD at 4.  See also N.M.S.A. §§ 74-4-1 - 74-4-17.

10.     In the Permit, the NM Environment Department identifies the "Bulk Fuel Facility Spill" at Kirtland AFB as an area with groundwater contamination that requires further investigation.  MTD at 5 (citing Permit ¶ 6.4.1.3, at 15).

11.     The Permit's Part 6 outlines each step the Air Force must take in its corrective action process for the Kirtland AFB cleanup, including the Air Force's cleanup of the Bulk Fuels Facility ("BFF").  \ Permit at 3, 5-8.

12.     In addition, the Permit's Part 6 outlines the Air Force's other routine, required submissions that it must make to the NM Environment Department, including its submissions of quarterly and annual progress reports.  MTD at 5 (citing Permit at 16-17).

13.     Finally, the Permit's Part 6 states that the Air Force may be required to make Interim Measures before its final remedy selection, if the regulator determines that Interim Measures are necessary while the Air Force's long-term corrective action remedies are being evaluated and implemented.  MTD at 5 (citing Permit at 9-10).

14.     In its Final Remedies section, the Permit provides that the Air Force will prepare a Corrective Measures Evaluation ("CME") Report for the NM Environment Department, which includes: (i) summaries of the investigations and corrective actions that the Air Force has implemented to date; (ii) identification of potential receptors, regulatory criteria, cleanup standards and corrective actions goals; and (iii) a list of options and recommendations for the final remedy or remedies.  MTD at 5 (citing Permit at 3, 5-8, 11-14, 16-17).

15.     In addition, under the Permit provisions, the NM Environment Department is authorized to propose a different remedy from the remedy that the Air Force recommends in their CME Report.  MTD at 5 (citing Permit at 5-7, 11-12).

16.     Before the NM Environment Department selects a final remedy or remedies, however, the NM Environment Department must provide: (i) public notice; (ii) an opportunity for public comment; and (iii) an opportunity for public hearing, where all interested persons may have an opportunity to submit data and written or oral comments.  See Permit at 5-7, 11-12.  See also N.M. Admin Code § 20.4.1.901; 40 C.F.R. Part 270).

17.     After the public meeting, the NM Environment Department will select a final remedy or remedies and issue a response to public comments.  See Permit at 5-7, 11-12.  See also NMAC § 20.4.1.901; 40 C.F.R. Part 270.

18.     After the NM Environment Department selects a final remedy, the Air Force will submit a Corrective Measures Implementation ("CMI") Work plan to the NM Environment Department, which will include: (i) design drawings; (ii) a construction plan; (iii) an implementation schedule; (iv) an operation and maintenance plan; and (iv) a performance monitoring plan for the selected remedy.  See Permit at 12.

19.     "Once NMED approves the CMI Work Plan, the Air Force will implement the final

remedy or remedies in accordance with the CMI Work Plan and implementation schedule."  MTD at 6 (citing Permit at 13-14).

20.    Pursuant to the Permit's permitted and regulatory corrective action process, the Air Force has performed various corrective actions at Kirtland AFB, including: (i) "replace[ing] the tanks and other structures"; (ii) "install[ing] vadose zone and groundwater monitoring wells"; (iii) "conduct[ing] investigations of soil and groundwater contaminants"; (iv) "implement[ing] soil vapor extraction to remove volatile organic compounds from the vadose zone"; and (v) "install[ing] four groundwater extraction wells and construct[ing] a carbon treatment system to remove contaminants from extracted groundwater."  Complaint ¶¶ 38-39, at 12-13.  See MTD at 5.

21.    Although Air Force's corrective actions, pursuant to the Permit, are still in the "investigative phase," the Air Force is "engaged in NMED-approved interim measures and, with NMED approval, will engage in the remaining steps in the corrective action process as outlined in the Permit until the final remedy is completed."  MTD at 1 (citing RCRA Facility Investigation Report at 2; Permit at 3, 5-14).

22.    Since November, 1999, "[a] portion of the leaked fuels has migrated off Kirtland Air Force Base property," and, in turn, "have formed a plume of contaminants in groundwater, most of which consists of light non-aqueous phase contaminants at or near the water table, and a more amorphous plume of hydrocarbon vapor in the unsaturated soils (vadose zone) above the water table."  Complaint ¶ 16, at 7.

23.    The "leaking and spilling of petroleum-based fuels from the bulk fuels facility" at Kirtland AFB "has created a plume of contaminated soil and groundwater extending more than a mile off the Kirtland Air Force Base property beneath a residential neighborhood. "  Complaint ¶

1, at 1.

24.     The "groundwater plume has migrated to the northeast beyond Gibson Boulevard, more than a mile from the source," and now, part of the plume, which is "estimated to be approximately 4,200 feet long and approximately 500 to 1,000 feet wide," is located "beneath a residential neighborhood."  Complaint ¶ 17, at 7.

25.     "Until recently . . . the groundwater plume mostly floated on the water table, approximately 500 feet below the ground surface," and "[s]ome of the petroleum hydrocarbons have also dissolved into the underlying groundwater."  Complaint ¶ 18, at 7.

26.     In 2009, the City of Albuquerque started reducing the pumping of the aquifer, and since that point, "the water table has risen, and the non-aqueous phase plume has been submerged," which, consequently, has made "remediation of groundwater contamination . . . more difficult."  Complaint ¶ 18, at 7.

27.     The risks which the leakage exposes to Albuquerque residents, with a central risk being that posed to the drinking water production.  See Complaint ¶ 19, at 7-8.

28.     Specifically, the "Authority operates five drinking water production wells in the Ridgecrest well field," with two of the wells, "Ridgecrest 3 and Ridgecrest 5," located "approximately two miles to the northeast of the bulk fuels facility."  Complaint ¶ 19, at 7-8.

29.     The wells' location means they are "less than a mile from the leading edge of the groundwater plume, which consists of ethylene dibromide."  Complaint ¶ 19, at 7-8.

30.     Furthermore, the "[p]etroleum-based fuels such as aviation gasoline, JP-4, JP-8 gasoline, and diesel fuel, contain several toxic constituents, including benzene, ethylbenzene, toluene, xylenes, 1,2-,4-trimethylbenzene, and polynuclear aromatic hydrocarbons such as naphthalene."  Complaint ¶ 20, at 8.

31.     In addition, "prior to 1973 . . . most commercial blended gasoline contained tetraethyl lead and ethylene dibromide (also known as 1,2-dibromoethan) as additives."  Complaint ¶ 20, at 8.

32.      "[T]he plume of contamination potentially threatens the Ridgecrest 3 and Ridgecrest 5 municipal supply wells operated by the Albuquerque-Bernalillo County Water Utility Authority ("Authority").  Complaint ¶ 1, at 1.

33.     Consequently, the plume of groundwater contaminants contains: (i) "benzene," which is "a known human carcinogen," Complaint ¶ 21, at 8; see id. ¶ 23, at 8; (ii) "[e]thylene dibromide," another known human carcinogen, which "forms the leading edge of the groundwater contaminant plume migrating the bulk fuel facility," Complaint ¶¶ 24,   26 at 9; (iii) "ethylbenzene," which is "a possible human carcinogen," Complaint ¶¶ 27-28, at 10; (iv) "toluene," which can "adversely affect[] liver and kidney function," and "results in adverse neurological effects in humans," Complaint ¶¶ 29-30, at 10; (v) "xylenes," which can, upon human exposure, "cause headaches, lack of muscles coordination, dizziness, confusion, irritation to the skin, eyes, nose and throat, and lung problems," Complaint ¶ 31-32, at 10-11; (vi) "1,2,4-trimethylbenze," which upon "dermal exposure," can cause "skin irritation in humans," and upon "[s]hort-term inhalation can cause lung irritation, headaches, fatigue, and drowsiness, and long-term inhalation may cause nervousness, tension and bronchitis," Complaint ¶¶ 33-34, at 11; and (vii) "naphthalene," which is a "possible human carcinogen," Complaint ¶¶ 35-36, at 11-12.

34.     On March 31, 2014, the Air Force submitted two reports to the NM Environment Department, including (i) an RCRA Facility Investigation Report, which addresses the vadose zone; and (ii) a second RCRA Facility Investigation Report, which addresses groundwater. Complaint ¶ 39, at 12.

35.     On August 27, 2014, however, the Air Force "retracted the two reports," and, later, on January 20, 2017, the Air Force "submitted a new RCRA Facility Investigation Report." Complaint ¶ 39, at 12.

36.     In a "letter dated August 3, 2017," the NM Environment Department indicates "that the report was deficient."  Complaint ¶ 39, at 12.

37.     Subsequently, the NM Environment Department sent a "'notice of deficiency' letter to the Air Force on November 16, 2017."  Complaint ¶ 39, at 12.

38.     Pursuant to the Permit, on August 29, 2018, the Air Force submitted a "Phase 1 RCRA Facility Investigation Report for the Bulk Fuel Facility" to the NM Environment Department.  Complaint ¶ 39, at 12.  See RCRA Facility Investigation Report ¶ 1, at 2. See also MTD at 6.

39.     The RCRA Facility Investigation Report outlines "the investigations, results, and interim measures conducted" from "November 11, 1999, until December 31, 2015," in addition to the Air Force's corrective actions related to the Kirtland AFB leak through the report's submission date.  RCRA Facility Investigation Report ¶ 1, at 2.

40.     In addition, the Phase 1 RFI provides "conclusions and recommendations regarding additional investigations required to continue the progress of the corrective action."  MTD at 6 (citing RCRA Facility Investigation Report ¶¶ 8.1-8.2, at 7-9).

41.     The NM Environment Department has yet to approve the investigation report.  See Complaint ¶ 39, at 12.  See also MTD at 6.

42.     In July, 2017, pursuant to the Permit's ¶ 6.2.4.5, which the RCRA Facility Investigation Report references, the Air Force submitted to the NM Environment Department a risk assessment report.  See MTD at 6 (citing Permit at 1).

43.     The NM Environment Department partially approved the Air Force's risk assessment report in July, 2017.  See MTD at 6 (citing Permit at 1).

44.     As of now, the Air Force "has not yet fully defined the northwest portion of the plume of groundwater contaminants."  Complaint ¶ 40, at 13.

45.     In addition, a "Corrective Measures Study" ("CMS"), the Air Force's "next step after a RCRA Facility Investigation," has "not yet been completed."  Complaint ¶ 40, at 13.

46.     Nor, has a "final remedy for cleanup of the groundwater contaminants . . . been selected or implemented," and, at present, "[t]here is no written work plan and no written schedule for completing the investigation, for completing a CMS, or for implementing a final remedy for cleanup of the contaminants in the soil and groundwater."  Complaint ¶ 40, at 13.

47.     Ultimately then, the Plaintiffs seek injunctive relief under the RCRA "to abate and mitigate the endangerment" risk posed by the plume of contamination based on the Air Force's "past or present handling, storage, or disposal of petroleum-based fuels from the bulk fuels facility at Kirtland Air Force Base," and, also "seek to recover their litigation costs."  Complaint ¶ 1, at 1.

## PROCEDURAL BACKGROUND

The Court outlines the procedural background in four sections.  First, the Court discusses the Plaintiffs' Complaint.  See Complaint ¶¶ 1-53, at 1-16.  Second, the Court discusses the Air Force's MTD.  See MTD at 1-13.  Third, the Court discusses the Plaintiffs' Response in Opposition to Motion to Dismiss, at 1-35, filed May 26, 2020 (Doc. 21)("Response").  Fourth, the Court discusses the Air Force's Reply in Support of Motion to Dismiss, filed July 9, 2020 (Doc. 33)("Reply").  Last, the Court discusses the July 21, 2020, hearing.  See Tr. at 1:3-55:11.

### 1.     The Complaint.

On February 2, 2020, the Plaintiffs filed the Complaint.  See Complaint ¶¶ 1-54, at 1-16.

The Plaintiffs request injunctive relief from the Court, because they argue that the release into the environment of solid wastes or hazardous wastes from the Air Force's Kirtland AFB in Albuquerque, poses an imminent and substantial endangerment to health or the environment, under the RCRA's § 7002(a)(1)(B) R, 42 U.S.C. § 6972(a)(1)(B).  See Complaint ¶ 1, at 1.  The Plaintiffs' allege that the  current endangerment is the result of Kirtland AFB's "past or present handling, storage, or disposal of petroleum-based fuels from the bulk fuels facility."  Complaint ¶ 1, at 1.

The Plaintiffs' Complaint includes four sections.  The first section outlines the parties' identities.  See Complaint ¶¶ 4-13, at 2-6.  The second and third sections outline the Plaintiffs' general allegations and claims for relief.  See Complaint ¶¶ 15-53, at 13-15.  The fourth section outlines the Plaintiffs' final prayer for relief.  See Complaint ¶ 54, at 15.  The Court will describe the sections below.

> ### a.    The Parties.

In the Complaint, the Plaintiffs first identify and provide relevant details of the individual Plaintiffs who bring this case.  See Complaint ¶¶ 8-11, at 4-6.  The first plaintiff, SWOP is "a not-for-profit corporation organized under the laws of the State of New Mexico for charitable purposes including . . . to empower disenfranchised people in New Mexico to realize racial and gender equality and social and economic justice."  Complaint ¶ 4, at 2.  The Plaintiffs contend that (i) "[s]ome of SWOP's members own homes that are located on property close to the plume of soil and groundwater contaminants"; "[s]ome of SWOP's members own residential property that may have declined in value due to the proximity of the plume of soil and groundwater contaminants"; and "[s]ome of SWOP's members own and reside in homes within Distribution Zone 3, which is served in part by the Ridgecrest 3 and Ridgecrest 5 municipal supply wells[,] and obtain their

drinking water from the Authority."  Complaint ¶ 4, at 2-3.  The Plaintiffs characterize SWOP as

a "'person'" under the RCRA's § 1004(15) and 7002(a).  Complaint ¶ 4, at 3 (quoting 42 U.S.C.

§§ 6903(15); 6972(a)).  The second plaintiff, Voices for Children, also is a:

> non-partisan, not-for-profit corporation organized under the laws of the State of
> New Mexico for charitable purposes including, among other things to develop and
> implement actions that support and promote the rights of children to grow in a
> healthful, secure, affirming and interdependent environment and to enable children
> to develop to their full individual potential.

Complaint ¶ 5, at 3.  The Plaintiffs contend that Voices for Children represents New Mexico

children who (i) "reside in homes that are located on property close to the plume of soil and

groundwater contaminants"; or (ii) "reside in homes within Distribution Zone 3, which is served

in part by the Ridgecrest 3 and Ridgecrest 5 municipal supply wells and obtain their drinking water

from the Authority."  Complaint ¶ 5, at 3.  The Plaintiffs characterize Voices for Children as a

"'person'" under the RCRA's §§ 1004(15) and 7002(a).  Complaint ¶ 4, at 3 (quoting 42 U.S.C.

§§ 6903(15); 6972(a)).  The next set of plaintiffs are natural persons, who include: (i) Senator

Stewart, who represents New Mexico Senate District 17; (ii) Senator Lopez, who represents New

Mexico Senate District 16; and (iii) Representative Romero, who represents House District 10.

See Complaint ¶ 4-6, at 3-4.  Stewart's, Lopez', and Romero's districts "include[] Kirtland Air

Force Base and also include[] part of the residential neighborhood north of Kirtland Air Force

Base that overlies the plume of soil and groundwater containments."  Complaint ¶¶ 6-8, at 3-4.

Senators Stewart, Lopez, and Romero obtain their drinking water from the authority.  See

Complaint ¶¶ 6-8, at 3-4.  The Plaintiffs characterize Senators Stewart, Lopez, and Romero, as

"'persons'" under the RCRA's §§ 1004(15) and 7002(a).  Complaint ¶¶ 6-8, at 3-4 (quoting 42

U.S.C. § 6903(15); 42 U.S.C. 6972(a)).  The final Plaintiffs are natural persons as well, and

include, (i) Cordova; (ii)  Juarez; and (iii) Smith, all of whom are Albuquerque residents.  See

Complaint ¶¶ 6-8, at 3-4.  Cordova, Juarez, and Smith own and reside in homes that are "close to the plume of soil and groundwater contaminant"; are "within Distribution Zone 3, which is served in part by the Ridgecrest 3 and Ridgecrest 5 municipal supply wells"; and "obtain their drinking water from the Authority."  Complaint ¶¶ 9-11, at 4-5.  In addition, Cordova, Juarez, and Romero are "concerned that the plume of soil and groundwater contamination may adversely affect [their] health and that of [their] family, [their] enjoyment of their homes, and [their] economic, recreation, and aesthetic interest in the neighborhood."  Complaint ¶¶ 9-11, at 4-5.  Cordova, Juarez, and Romero are SWOP members, and, the Plaintiffs characterize them as "'person[s]'" under the RCRA's §§ 1004(15) and 7002(a).  Complaint ¶ 9-11, at 4 (quoting 42 U.S.C. § 6903(15); 6972(a)).

The Air Force is a DOD service and a "department, agency, or instrumentality of the United States."  Complaint ¶ 12, at 6.  The Air Force "owns and operates Kirtland Air Force Base near Albuquerque in New Mexico."  Complaint ¶ 12, at 6.  Kirtland AFB is a "United States military air base constructed in 1941," which currently "occupies 52,000 acres southwest of and adjacent to the city of Albuquerque."  Complaint ¶ 14, at 6.  The Plaintiffs characterize the Air Force as a "'person'" under the RCRA's §§ 1004(15) and 7002(a).  Complaint ¶¶ 9-11, at 4 (quoting 42 U.S.C. §§ 6903(15); 6972(a)).

    **b.**    <u>**Claims for Relief.**</u>

The Plaintiffs bring two claims for relief.  <u>See</u> Complaint ¶ 41, at 13.  First, the Plaintiffs request injunctive relief, enjoining the Air Force's actions causing "imminent and substantial endangerment to health and the environment."  Complaint ¶ 40, at 13.  In support of their first claim, the Plaintiffs contend that the

> Air Force has engaged in and contributed to the "handling," "storage" and "disposal" of petroleum based fuels including at various times aviation gasoline,

> JP-4, JP-8, gasoline, and diesel fuel, at the bulk fuel facility at Kirtland Airforce
> Base within the meaning of sections 1004(3), 1004(33), and 7002(a)(1)(B) of
> RCRA, 42 U.S.C. §§ 6903(3), 6903(33), 6972(a)(1)(B).

Complaint ¶ 42, at 13 (quoting 42 U.S.C. §§ 6903(3), 6903(33), 6972(a)(1)(B)). The Plaintiffs, in

turn, contend that the Air Force's

> "handling," "storage," and "disposal" of petroleum based fuels at the bulk fuels
> storage facility at Kirtland Air Force Base has caused the fuels, including aviation
> gasoline, JP-4, JP-8, gasoline, and diesel fuel, to leak or spill into soil and
> groundwater beneath Kirtland Air Force Base, and to migrate off the base property.

Complaint ¶ 43, at 13 (quoting 42 U.S.C. §§ 6903(3), 6903(33), 6972(a)(1)(B)). Furthermore, as

the Plaintiffs explain, "[t]he petroleum-based fuels, including aviation gasoline JP-4, JP-8,

gasoline, and diesel fuel that have leaked or spilled into soil and groundwater from the bulk fuels

facility at Kirtland Air Force Base" constitute, under "sections 1004(5) and 7002(a)(1)(B) of

RCRA, 42 U.S.C. §§ 6904(5), 6972(a)(1)(B)," "hazardous waste. Complaint ¶ 45, at 14 (quoting

42 U.S.C. §§ 6903(3), 6903(33), 6972(a)(1)(B)). In addition, the Plaintiffs contend that, under

"section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B)[,] . . . soil and groundwater are part

of the 'environment,'" and the Air Force's "'handling,' 'storage,' and 'disposal' of petroleum-

based fuels,   may present an imminent and substantial endangerment to health and the

environment." Complaint ¶ 46, at 14 (quoting 42 U.S.C. §§ 6903(3), 6903(33), 6972(a)(1)(B)).

The Plaintiffs further support their first claim with reference to the facts that (i) the "groundwater

aquifer beneath and adjacent to Kirtland Air Force Base is a source of drinking water for the City

of Albuquerque," Complaint ¶ 47, at 14; and (ii) "[b]y letter dated May 31, 2019, counsel for the

Residents provided the Air Force, the Administrator of EPA, and the State of New Mexico with

notice of the endangerment in accordance with section 7002(b)(3)(A) of RCRA, 42 U.S.C. §

6972(B)(2)(A)," Complaint ¶ 48, at 14. Ultimately, then, under claim one, the Plaintiffs contend

that the "Air Force is liable for injunctive relief to take action to abate the endangerment to health

and the environment under section 7002(a) of RCRA, 42 U.S.C. § 6972(a)."  Complaint ¶ 50, at 14.

Under their second claim for relief, the Plaintiffs re-allege their general allegations as set forth above, and request their costs of litigation from the Air Force, "including reasonable attorney and expert witness fees, in the amount of at least $10,000.00," in addition to their "continuing to incur litigation costs."  Complaint ¶ 52, at 15.  In sum, then, the Plaintiffs request their "costs of litigation, including reasonable attorney and expert witness fees, under section 7002(E) of RCRA, 42 U.S.C. § 6972(e)." Complaint ¶ 53, at 15.  The Plaintiffs also request that the Court grant "such other relief as this Court may deem just and proper."  Complaint ¶ 54, at 15.

**2.      The Motion to Dismiss.**

On April 20, 2020, the Air Force filed its MTD.  See MTD at 1-24.  In the MTD, the Air Force requests the Court "to dismiss the Plaintiffs' Complaint for Injunctive Relief," based on a lack of subject-matter jurisdiction, pursuant to rule 12(b)(1) of the Federal Rules of Civil Procedure, and based on the doctrine of primary jurisdiction.  See MTD at 1.  The Air Force advances two arguments in support of its MTD.  See MTD at 7.  First, the Air Force argues that the Plaintiff's Complaint does not adequately plead subject-matter jurisdiction, because the Complaint represents an "unlawful collateral attack on the permit" that the NM Environment Department issued to the Air Force under the RCRA and under the New Mexico Hazardous Waste Act, N.M.S.A. §§ 74-4-1 - 74-4-14 ("NMHWA").  MTD at 7.  Second, the Air Force contends that the Court should dismiss the Plaintiffs' Complaint because "the primary jurisdiction doctrine supports deferral to NMED's regulation of the Air Force's corrective action related to Kirtland Bulk Fuel Facility."  MTD at 7.

> **a.    The Air Force Asserts that the Court Lacks Subject-Matter Jurisdiction, Because the Plaintiffs' RCRA Citizen-Suit is a Collateral Attack on the Permit the NM Environment Department Issued to the <u>Air Force</u>.**

First, the Air Force requests that the Court dismiss the Plaintiffs' Complaint, because the Plaintiffs do not establish subject-matter jurisdiction, pursuant to rule 12(b)(1).  <u>See</u> MTD at 7.  As the Air Force explains, the Court does not have subject-matter jurisdiction over this case, because, in continuing to mitigate the effects of the leakage discovered at Kirtland AFB in 1999, the Air Force is "conducting a corrective action" under a "permit" that the NM Environment Department issued to the Air Force, which authorizes the Air Force "to remedy the historic fuel leak that is the subject" of the Plaintiffs' "imminent hazard complaint."  MTD at 7.  Furthermore, as the Air Force continues, "[w]hen NMED decided to issue the Permit . . . [,] NMED did impose limited deadlines on the correction action process" that the Air Force would employ in  conducting its "corrective action."  MTD at 7.  The problem then, according to the Air Force, is that, in their Complaint, the Plaintiffs "are now asking the Court to impose more specific deadlines," MTD at 7, which is in violation of precedent from the United States Court of Appeals for the Tenth Circuit, which holds that the "'[RCRA] does not allow collateral attacks on Environment Protection permit decisions or those of state agencies with federally designated authority.'"  MTD at 7-8 (quoting <u>Chemical Weapons Working Group v. United States Dep't of the Army</u>, 111 F.3d 1485, 1492 (10th Cir. 1997)(emphasis and alterations in original).  The Air Force emphasizes in particular, the Tenth Circuit's discussion in <u>Chemical Weapons Working Group v. United States Dep't of the Army</u>, where it indicates that "allowing federal courts to exercise jurisdiction over such suits 'would severely undermine the limited judicial review of agency permit decisions proved under [RCRA] allowing disgruntled individuals to circumvent' that process."  MTD at 8 (quoting <u>Chemical Weapons Working Group v. United States Dep't of the Army</u>, 111 F.3d at 1492).

Furthermore, as the Air Force explains, Tenth Circuit rulings, as well as other circuits' rulings, specifically prohibit the type of collateral attack that the Plaintiffs are bringing against the Air Force, because, essentially, the Plaintiffs are requesting that (i) the Court conclude that the Air Force's actions are causing imminent and substantial endangerment under the RCRA, and, (ii) order injunctive relief because of the 1999 fuel at Kirtland AFB's Bulk Fuels Facility.  MTD at 8 (citing Complaint  ¶¶ 16, 42-50, at 7, 13-14; 42 U.S.C. § 6901).  See also id. at 10-11 (citing Chem. Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492; Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d 1174, 117, 1181 (6th Cir. 1993)).  The Air Force contends that the Plaintiffs' requests here are inappropriate and collateral, because the Air Force is already addressing the Kirtland AFB leak, pursuant to the NM Environment Department Permit issued in July, 2010.  See MTD at 8.  Under the NM Environment Department Permit's authority, the Air Force has continued to implement corrective actions and regulatory efforts.[1]  See MTD at 8.  The Air Force, therefore, characterizes the Plaintiffs' suit as a "citizen suit," which "is nothing more than an attack on NM Environment Department's decision to issue the Permit without a fixed schedule for corrective action, and an attempt to circumvent the limits of the state's comprehensively composed administrative and judicial review processes for New Mexico's Hazardous Waste Act Permits."  MTD at 8.

To further support its contention that the Air Force is "operating within a Permit issued and regulated by the NM Environment Department that addresses the imminent hazard" the Plaintiffs

---

[1]As support for the mitigation efforts it has been taking pursuant to the NM Environment Department Permit, the Air Force refers the Court to NM Environment Department's Hazardous Waste Bureau's website, which details "all the regulatory actions that have bene taken regarding Kirtland's AFB's Bulk Fuel Facility.  MTD at n.5 (citing NM Environment Department, Hazardous Waste Bureau: Kirtland Air Force Base, last visited February 27, 2021, https://www.env.nm.gov/hazardous-waste/kafb/).

contend that the Air Force as committed under the RCRA, the Air Force explains that, since November, 1999, the NM Environment Department has actively "regulated remedial efforts related to cleaning any contamination from the fuel spill," which have included: (i) "approv[ing] groundwater abatement plans, groundwater interim measures, groundwater reporting, sampling, and analysis requirements, plot plan testing for groundwater remedies, weekly active reports, and quarterly remediation and site investigation reports."   MTD at 9 (citing NM Environment Hazardous Waste Bureau: Kirtland Air Force Base Summary Report at 1, filed April 20, 2020 (Doc. 13-3)("Kirtland AFB Summary Report").  Accordingly, as the Air Force explains further, Plaintiffs do not "allege that the Air Force is in violation of its Permit," nor, in fact, do they even "mention the Permit in their Complaint."  MTD at 9.  Moreover, if the Plaintiffs are "concerned that the Permit did not adequately provide for remediation of the contamination from the historic fuel spill, or that it did not include a written schedule for completion of the corrective, action," they had various other avenues to pursue.  For example,

> Plaintiffs could have raised that issue through the public comment process and requested a public hearing to be held in accordance with Section 74-4-4.2(H) of New Mexico's Hazardous Waste Act. N.M. Admin. Code § 20.4.1.901(A). And if Plaintiffs were not satisfied with the final permit, Plaintiffs could have sought judicial review via New Mexico's Court of Appeals. N.M. Stat. Ann. § 74-4-14(A). The Hazardous Waste Act's implementing regulations also allow for "any interested person" to request a permit modification. N.M. Admin. Code § 20.4.1.901(B)(2).  If the request for modification is denied, the denial may be appealed in accordance with the 30-day limitations period in Section 74-4-14(A) of New Mexico's Hazardous Waste Act.

MTD at 9.

The Air Force also points out that, problematically, the Plaintiffs offer "little detail on what more they believe the Air Force should be doing, and, instead, merely state in their Complaint that:

> As of this date, the Air Force has not yet fully defined the northwest portion of the plume of groundwater contaminants [from the Bulk Fuel Facility].  A Corrective Measures Study (CMS) -- the next step after a RCRA Facility

> Investigation -- has not yet been completed. A final remedy for cleanup of the groundwater contaminants has not been selected or implemented. There is no written work plan and no written schedule for completing the investigation, for completing a CMS, or for implementing a final remedy for cleanup of the contaminants in the soil and groundwater.

MTD at 10 (quoting Complaint ¶ 40, at 13).  The Air Force notes, however, that because the Plaintiffs' statements are addressed by the NM Environment Department Permit, specifically, within the Permit's ¶ 6.2.2.2, which addresses "'Corrective Measures,'" including the "'Corrective Measures Study,'" and ¶ 6.2.2.2.6, which addresses the "'Remedy Selection,'" and ¶ 6.2.2.2.7, which addresses the "'Corrective Measures Implementation (CMI) Work Plan,'" MTD at 9 (quoting Permit at 5-10), then the "Plaintiffs' requested injunctive relief is, thus, in effect, a challenge to the Permit."  MTD at 10.  This represents a barred collateral attack because, as the Air Force explains, "the Permit already sets a structure and plan for taking all the measures that Plaintiffs claim have not yet begun."  MTD at 10 (citing Complaint ¶ 40, at 13; Permit at 5-10).

> Notwithstanding that the Permit already sets a structure and plan for taking all the measures that Plaintiffs claim have not yet begun, see Compl. ¶ 40, Plaintiffs ask the Court to set its own "reasonable but aggressive schedule." In essence, under the guise of an imminent-hazard suit, Plaintiffs are asking this Court to modify the portions of the Permit related to the manner of accomplishing the Corrective Action for the historical Bulk Fuel Facility fuel spill, and to impose a schedule that NM Environment Department did not include when it decided to issue the Permit. As discussed in the next section, the Tenth Circuit has precluded such collateral attacks.

MTD at 10 (citing Complaint, ¶ 40, at 13).

Next, the Air Force argues that the Court should dismiss the Plaintiffs' Complaint on the grounds of a lack of subject-matter jurisdiction, because RCRA Section 6972(a)(1)(B) "was not intended to authorize citizen suits against people operating within the limits of valid RCRA permits."  MTD at 11.  As the Air Force continues, "the Tenth Circuit has explicitly stated that collateral attacks on state-issued RCRA permits are not within a federal court's jurisdiction,

reasoning that exercising jurisdiction in such cases would 'severely undermine' limited judicial review provisions.  MTD at 11 (quoting Chem. Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492 and citing Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d 1174, 1178, 1181 (6th Cir. 1993)(citizen-suit provision does not confer district court jurisdiction over collateral challenges to prior permitting decisions; doing so would render permit appeal procedures meaningless);  Palumbo v. Waste Technologies Industries, 989 F.2d 156, 162 (4th Cir.1993)(allowing collateral attacks would encourage permit "opponents . . . to avoid placing themselves at the disadvantage of appealing an RCRA permit in the court of appeals . . ., when they only need wait until the permit has been issued to attack it in district court as an imminent and substantial endangerment under the far less restrictive rules governing § 6972(a)(1)(B) suits."). Furthermore, as the Air Force explains, even though the Tenth Circuit cases dealt with the review of EPA-issued RCRA permits under 42 U.S.C. § 6976(b), the Tenth Circuit's "concerns apply equally to state issued-permits," meaning that the Tenth Circuit's holdings are applicable here to the NM Environment Department Permit issued to the Air Force.  MTD at 11 (citing Chem. Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492).  Based on Tenth Circuit law, then, as the Air Force explains, "allowing a collateral attack on NMED's hazardous-waste permit for Kirtland AFB would severely undercut New Mexico's Hazardous Waste Act's permit appeal procedures, under which Plaintiffs had thirty days to seek review of the Permit." MTD at 11 (citing N.M.S.A. §§ 74-4-4.2; 74-4-14(A); NMAC § 20.4.1.901(B)).  Furthermore, the Air Force argues that the Plaintiffs' actions here -- namely, bringing this lawsuit "almost a full decade after this thirty-day limitations period expired" under the NMHWA -- represents "the very behavior the Tenth Circuit cautioned against in finding RCRA Permits must be directly appealed to the appropriate Court of Appeal."  MTD at 11 (quoting Chem. Weapons Working Group v.

United States Dep't of the Army, 111 F.3d at 1492 ("Indeed, recognizing jurisdiction in this case would . . . allow[] disgruntled individuals to circumvent the Act's 90-day window for directly challenging such decisions and deferential standard of review.")).

Last, the Air Force emphasizes that, in the case that the Court does not exercise subject-matter jurisdiction over this matter, the Plaintiffs still can pursue various redress avenues against the Air Force, if they wish to do so.  See MTD at 11.  For example, the

> Plaintiffs may seek modification of the Permit in accordance with the Hazardous Waste Act's implementing regulations which allow "any interested person" to request a permit modification. See N.M. Admin. Code § 20.4.1.901(B)(2). If NMED denies the modification request, Plaintiffs may appeal under Section 74-4-14(A) of the Hazardous Waste Act. NMED itself also retains authority to modify, suspend, or revoke the Permit in response to changed circumstances or new hazards. N.M. Stat. Ann. §§ 74-4-4.2(D)(6), 74-4-13(A); see also Greenpeace, Inc., 9 F.3d at 1182 ("EPA can modify or terminate a previously issued permit at any time if it determines that a facility presents an imminent and substantial endangerment to health or the environment.").

MTD at 12.  In addition, the Air Force continues, "if Plaintiffs believe that the Air Force is not complying with the Permit . . . they may bring a citizen suit under 42 U.S.C. § 6972(a)(1)(A)." MTD at 12.  See 42 U.S.C. § 6972(a)(1)(A).

Nonetheless, according to the Air Force, because the Plaintiffs do not allege in their Complaint that the Air Force is not complying with the Permit, nor, in fact, as the Air Force further emphasizes, do the Plaintiffs even reference the NM Environment Department Permit, under which the Air Force currently is addressing the Kirtland AFB spill's effects, the Plaintiffs cannot, under the RCRA, advance an "imminent and substantial endangerment citizen suit to attempt to impose a schedule NMED did not include when it decided to issue the Permit."  MTD at 12.  See 42 U.S.C. § 6972(a)(1)(B).  Accordingly, the Air Force concludes that, because the Plaintiffs are advancing merely an impermissible collateral attack, which the Tenth Circuit's interpretation of RCRA's § 7002(a) prohibits, see Chem. Weapons Working Group v. United States Dep't of the

<u>Army</u>, 111 F.3d at 1492, then the Plaintiffs' Complaint "must be dismissed due to a lack of subject matter jurisdiction,"  MTD at 12.

> **b.    The Air Force Asserts, in the Alternative, that Pursuant to the Primary Jurisdiction Doctrine, the Court Should Defer to the NM Environment Department's Expertise in Regulating the Air Force's Mitigation Actions, Because the NM Environment Department is the Expert Regulatory Agency in Hazardous Waste Environment Cleanup <u>Matters</u>.**

In the alternative, the Air Force requests that the Court "follow the doctrine of primary jurisdiction by deferring to NMED's commenced regulatory plan and dismissing Plaintiff's complaint."  MTD at 12.   Specifically, the Air Forces argues that, under <u>United States v. Philadelphia National Bank</u>, 374 U.S. 321, 353 (1963), the Court should defer to the NM Environment Department's commenced regulatory plan pursuant to the Permit it issued to the Air Force in July, 2010, because, "where cases implicate the regulatory functions of an administrative agency, the Court should defer to the agency prior to acting on the case."  MTD at 12 (citing <u>United States v. Philadelphia National Bank</u>, 374 U.S. at 353).  Relatedly, the Air Force explains that the primary jurisdiction "doctrine requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme."  MTD at 13 (quoting <u>United States v. Philadelphia National Bank</u>, 374 U.S. at 353 (citing <u>Far East Conference v. United States</u>, 342 U.S. 570 (1952); <u>Great Northern R. Co. v. Merchants Elevator Co.</u>, 259 U.S. 285 (1922)).

In turn, as the Air Force continues, the Tenth Circuit enumerates a five-factor standard that courts must consider when evaluating the primary jurisdiction doctrine's applicability to its exercise of jurisdiction over a case.  <u>See</u> MTD at 13 (citing <u>Friends of Santa Fe County v. Lac Minerals</u>, 892 F. Supp. 1333, 1349-50 (D.N.M. 1995)(Hansen, J.)).  These factors include: (i) "whether [the Court] is being called upon to decide factual issues not within the conventional

experience of judges;" (ii) "whether Defendants could be subjected to conflicting orders of both the Court and the administrative agency;" (iii) "whether relevant agency proceedings have actually been initiated;" (iv) "whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to languish"; and (v) "the type of relief Plaintiffs request." MTD at 13 (quoting Friends of Santa Fe County v. Lac Minerals, 892 F. Supp. at 1349-50 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1376-77 (10th Cir. 1989)).  Here, according to the Air Force, the Plaintiffs' Complaint and requested relief "trigger the primary jurisdiction doctrine," based on a weighing of the Tenth Circuit's five factors that govern the doctrine's applicability. MTD at 13.  See Friends of Santa Fe County v. Lac Minerals, 892 F. Supp. at 1349-50 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d at 1376-77)).  Specifically, as the Air Force explains, under Tenth Circuit law, the primary jurisdiction doctrine must apply, because, first, under the standard's fifth element, the Plaintiffs are "seeking injunctive relief relating to a matter NMED is actively regulating under its delegated authority under RCRA and New Mexico's Hazardous Waste Act."  MTD at 13 (citing Complaint ¶¶ 38-39, 50, at 13-14.  Second, according to the Air Force, under the standard's elements three and four, the Air Force, beginning in 1999, already "initiated remedial actions to clean contamination from the historic fuel spill."  MTD at 13 (citing Kirtland Air Force Base Phase I RCRA Facility Investigation Report, August 2018, ¶ 1, at 2, filed April 20, 2020 (Doc. 13-1)("RCRA Facility Report")).  Furthermore, according to the Air Force, also pursuant to the standard's third and fourth elements, the Air Force's "remedial efforts are still in progress and regulated by NMED under the corrective action section of the Permit." MTD at 13 (citing Complaint ¶ 39, at 12).  Next, according to the Air Force, under the standard's element one, the Plaintiffs' "requested relief will require this Court to evaluate complex factual issues that are outside of the routine experience of judges," whereas, the technical issues related to

hazardous waste cleanup governed by the NM Environment Department's Permit "are within the expertise and specialized experience of NMED." MTD at 13 (citing N.M.S.A. §§ 74-4-1 to 17,; 42 U.S.C § 6926(d)). Finally, according to the Air Force, under the standard's element two, there is a risk that, "if the Court ordered the Plaintiffs' requested relief, the Air Force may be exposed to contradictory orders from NMED and the Court since NMED has been exercising regulatory oversight." MTD at 13. Ultimately, then, the Air Force concludes that, because "the primary jurisdiction doctrine factors weigh in favor of this Court deferring to NMED's federally delegated regulatory authority . . . [the] Plaintiff's complaint should be dismissed." MTD at 13-14. See Friends of Santa Fe County v. Lac Minerals, 892 F. Supp. at 1349-50 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d at 1376-77)).

    **3.**    **The Response.**

    On May 26, 2020, the Plaintiffs filed a Response. See Response at 1. The Plaintiffs advance two theories to support their initial argument that the Court should exercise subject-matter jurisdiction over this case. See Response at 8. First, the Plaintiffs argue that the RCRA's § 7002(b)'s preclusive provision does not preclude citizen suits advanced against a party's corrective action pursuant to a federally authorized permit. Response at 16. See also 42 U.S.C. § 6972(b). Specifically, the Plaintiffs explain that, when enacting the RCRA's § 7002(b), 42 U.S.C. § 6972(b), Congress determined that several actions to achieve environmental pollution cleanup under federal law should preclude an imminent hazard citizen suit.[2] See Response at 16. Based on Congress'

---

    [2]Under § 6972(b)(2)(B), an imminent hazard citizen suit is precluded if the EPA, "in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment":

---

(i)      has commenced and is diligently prosecuting an action under section 7003 of this Act or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980;

(ii)      is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980;

(iii)      has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and is diligently proceeding with a remedial action under that Act; or

(iv)      has obtained a court order (including a consent decree) or issued an administrative order under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or section 7003 of this Act pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.

42 U.S.C. § 6972(b)(2)(B)

Under § 6972(b)(2)(C), an imminent hazard citizen suit is precluded if the state, "in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment":

(i)      has commenced and is diligently prosecuting an action under subsection (a)(1)(B);

(ii)      is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980; or

(iii)      has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and is diligently proceeding with a remedial action under that Act.

42 U.S.C. § 6972(b)(2)(C).

Under § 6972(b)(2)(D), an imminent hazard citizen suit is precluded: "by any person (other than a State or local government) with respect to the siting of a hazardous waste treatment,

determinations, the Plaintiffs state that "corrective action pursuant to a permit issued under RCRA or state law" is absent from the list of preclusive actions set forth in the RCRA's § 7002(b), 42 U.S.C. § 6972(b).  Response at 18.  Relatedly, the Plaintiffs advance that, "[w]here Congress explicitly enumerates certain exceptions to a general provision, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  Response at 18 (citing Hillman v. Maretta, 569 U.S. 483, 496 (2013); TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001); Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980)).  The Plaintiffs contend, therefore, that it is not plausible "that Congress inadvertently overlooked corrective action when it drafted section 6972 of RCRA."  Response at 18 (citing 42 U.S.C. § 6972(b)).  The Plaintiffs allege that Congress' omission of corrective actions indicates "that Congress did not intend corrective actions under a permit to preclude an imminent hazard suit."  Response at 18.  Accordingly, the Plaintiffs argue that, because "the Environment Department's effort to achieve cleanup of the leaked fuel under the general corrective action provisions of the hazardous waste permit is an administrative action," then the RCRA's § 7002(b)(2)(b), 42 U.S.C. § 6972(b)(2)(B), does not preclude an imminent hazard suit.  Response at 19.  Ultimately, then, the Plaintiffs conclude that "to dismiss this case because of corrective action efforts under a permit would contravene Congress' intent, as carefully expressed in section 6972(b)(2) of RCRA."  Response at 19.

Next, the Plaintiffs dispute the Air Force's characterization of their action as a collateral attack on the NM Environment Department Permit.  See Response at 19.  Specifically, the Plaintiffs state that the Air Force "mischaracterizes the nature of the Plaintiff's action as one challenging the permit."  Response at 20.  The Plaintiffs also allege that the Air Force's MTD

---

storage, or a disposal facility, [or] to restrain or enjoin the issuance of a permit for such facility." 42 U.S.C. § 6972(b)(2)(D).

erroneously "assumes that the Plaintiffs had a meaningful opportunity to challenge the corrective action during the permit proceeding." Response at 20. Here, the Plaintiffs contend that the Air Force's argument "is at odds with the provisions of RCRA and defies congressional intent." Response at 20. The Plaintiffs state further that the Air Force's collateral attack argument is flawed, because "the Plaintiff's action is not a challenge to the hazardous waste permit." Response at 20. Instead, the Plaintiffs explain that they "are not asking this Court to modify, suspend, or revoke the permit, or to take any other action regarding the permit," nor are they "seeking to enjoin or restrain the issuance of the permit." Response at 20. Rather, the Plaintiffs argue that they are seeking merely "an order enjoining the Air Force specifically to address the imminent and substantial endangerment resulting from the fuel leak from the Bulk Fuels Facility." Response at 20. The Plaintiffs support their request for a court order "enjoining the Air Force . . . to address the imminent and substantial endangerment" resulting from the Kirtland AFB's fuel leak, by stating that: (i) at present, there is "little in the permit relating to the fuel leak that the Plaintiffs could challenge"; and (ii) the "permit was not written to address the plume from the Bulk Fuels Facility leak." Response at 20-21. Ultimately, then, the Plaintiffs conclude that, because they are "seeking cleanup of leaked fuel that is unrelated to the permitted activity," they are not attacking the NM Environment Department Permit. Response at 21.

Next, the Plaintiffs argue that the Court should exercise subject-matter jurisdiction over the case, because they had "no meaningful opportunity to address the Bulk Fuels Facility Leak in the permit proceeding." Response at 21. Rather, the Plaintiffs state that the NM Environment Department released the draft Permit for public comment on April 16, 2007, and accepted public comment on the proposed permit for 60 days, from April 16, 2007 to June 15, 2007. Response at 22. The Plaintiff's contend, however, that before and during the public comment period, the

following documents made "no mention of the leak from the bulk fuel facility": (i) the public

notice announcing the proposed Permit; (ii) the Permit's associated fact sheet; and (iii) the Permit's

related press release.  Response at 22.  The Plaintiffs contend that the draft Permit itself listed the

Bulk Fuels Spill only once, within a list of 100 sites that were characterized as potentially requiring

corrective action.  Response at 22.  Compounding the lack of notice announcing the draft Permit ,

the Plaintiffs argue that the only notice announcing the final Permit "did not mention the leak from

the Bulk Fuels Facility."  Response at 22.  The Plaintiffs conclude, therefore, that "the public notice

on the proposed hazardous waste treatment permit did not apprise the public of the proposed

cleanup of the Bulk Fuels Facility leak,"  Response at 23, and consequently, their potential redress

avenue of filing a petition with the Environment Department to modify the Permit, was not "a

practical option."  Response at 23.

       Next, the Plaintiffs argue that the "RCRA does not support the Air Force's Collateral

Attack argument in the context of this case."  Response at 23.  Specifically, the Plaintiffs state that

the RCRA's § 6972(b)(2)(D)[3] "does not preclude an imminent hazard citizen suit where a

permitted facility is implementing corrective action to address that imminent hazard."  Response

at 24.  Moreover, the Plaintiffs argue that "the cases the United States relies on for its Collateral

Attack" argument are inapposite.  Response at 24.  Most critically, the Plaintiffs contend that the

facts of Chemical Weapons Working Grp v. U.S. Dep't of the Army, 935 F. Supp. 1206, 1209 (D.

Utah 1996)(Campbell, J.), "are very different, in significant ways, from the facts of this case."

Response at 24.  Specifically, the Plaintiffs explain that a crucial distinction between Chemical

---

     [3]Section 6972(b)(2)(D) of RCRA precludes an imminent hazard citizen suit "with respect
to the siting of a hazardous waste treatment, storage, or a disposal facility, [or] to restrain or
enjoin the issuance of a permit for such facility." 42 U.S.C. § 6972(b)(2)(D).

Weapons Working Grp., 935 F. Supp 1206, and the present case is that,  in the former case, "the plaintiffs' imminent hazard claim challenged the permitted activity itself."  Response at 25.  In this case, however, the Plaintiffs state that they "are seeking a cleanup of leaked fuel that is entirely unrelated to the permitted activity."  Response at 25.  In addition, the Plaintiffs argue that, unlike this case's circumstances, the permitted facility in Chemical Weapons Working Grp v. U.S. Dep't of the Army, was a hazardous waste incinerator, making the U.S. Army subject to 40 C.F.R § 270.62(b)(5)(ii)[4].  Response at 26 (citing 935 F. Supp. at 1209).  Here, however, the Plaintiffs explain that the "open detonation unit at Kirtland Air Force Base is not an incinerator," and the "Environment Department made no such finding before issuing the hazardous waste permit." Response at 26.  The Plaintiffs conclude, therefore, that "two substantial blocks of the foundation supporting the Chemical Weapons decision -- section 6972(b)(2)(D) of RCRA and the permit regulations at 40 C.F.R. § 270.62(b)(5)(ii) -- are inapplicable and will not support a similar decision in this case."  Response at 26 (citing Chemical Weapons Working Grp v. U.S. Dep't of the Army, 935 F. Supp. at 1209).  Additionally, the Plaintiffs argue that in Chemical Weapons Working Grp v. U.S. Dep't of the Army, "the information on the alleged imminent hazard had been fully considered in the permit proceeding," whereas, in this case, "the situation has changed markedly and a great deal of information has come to light since the Environment Department issued the proposed permit for public comment in 2007 and issued the final permit in 2010." Response at 26-27 (citing 935 F. Supp. at 1209).

The Plaintiffs subsequently turn to their primary jurisdiction argument, stating that, under

---

[4] The Code of Federal Regulations' § 270.62(b)(5)(ii) requires that, before issuing a permit for a hazardous waste incinerator, the EPA, or the state, must determine that the incineration trial burn "will not present an imminent hazard to human health or the environment."  40 C.F.R. § 270.62.(b)(5)(ii).

Tenth Circuit law, "the doctrine of primary jurisdiction is inappropriate in this case."  Response at 27.  Specifically, the Plaintiffs contend that the primary jurisdiction doctrine is "poorly suited to the facts of this case," based on the following three considerations: (i) whether the issues are within the conventional experience of judges or whether they involve technical or policy considerations within the agency's particular field of expertise; (ii) whether there exists a substantial danger of inconsistent rulings; and (iii) whether the agency has initiated proceedings and is diligently resolving the issue.  Response at 28 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1376-77 (10th Cir, 1989); Raritan Baykeeper v. NL Indus., 660 F.3d 686, 691 (3d Cir. 2011)).  First, the Plaintiffs state that "the issues in this case are within the experience of Federal Courts and Judges."  Response at 28.  Relatedly, the Plaintiffs contend that in Raritan Baykeeper v. NL Indus, the United States Court of Appeals for the Third Circuit stated that, in situations where a case's issue "is not one peculiarly within the agency's area of expertise, but is one which courts or jury are equally well-suited to determine, the court must not abdicate its responsibility."  Response at 28 (citing 660 F.3d at 691).  In addition, the Plaintiffs argue that both themselves, and the Air Force have retained experts "who can assist the Court in fashioning an injunctive order."  Response at 29.  Moreover, the Plaintiffs state that, "[g]iven the expressed intent of Congress that courts address environmental cleanup issues, and given that the Federal courts are competent to address such issues, this consideration weighs in favor of the Court exercising jurisdiction in this case."  Response at 29.  Second, the Plaintiffs argue that the Tenth Circuit primary jurisdiction factors weigh in favor of not applying the doctrine, because "conflicting orders from this Court and the Environment Department are unlikely."  Response at 29.   In addition, the Plaintiffs state that the conflicting orders are unlikely, because the "RCRA corrective action is still in the early stages," and the "Environment Department has not yet selected a final remedy."   Response at 30.

Furthermore, the Plaintiffs contend that "the parties can consult with the Environment Department in crafting an injunctive order for the Court's approval that is consistent with the Department's views." Response at 30.  Third, the Plaintiff's advance that "the facts do not support the conclusion that the Air Force and the Environment Department are proceeding diligently to clean up the fuel leak."  Response at 30.  Under this primary jurisdiction factor, the Plaintiffs argue that there has been "substantial administrative delay in addressing the leaked fuel from the Bulks Fuel Facility." Response at 31.  To support their argument, the Plaintiffs emphasize the fact that the Air Force first discovered the leak in 1999, but have not yet "completely characterized the groundwater plume, nor conducted adequate remediation."  Response at 31.  The Plaintiffs argue, therefore, that, "[g]iven the administrative delay in completing the investigation and selecting a remedy, this consideration weighs heavily in favor of the Court taking jurisdiction of this case."  Response at 32.  In sum, the Plaintiffs state that "the considerations that courts have applied in deciding whether to exercise jurisdiction, or to invoke the doctrine of primary jurisdiction, weigh in favor of this Court retaining jurisdiction over this case," and, relatedly, the "corrective action for the investigation and cleanup of the fuel leaked from the Bulks Fuel Facility . . . calls for judicial supervision."  Response at 32 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d at 1376-77). The Plaintiffs, therefore, argue that "[t]he Court should deny the United States' motion to dismiss." Response at 32.

**4.      The Reply.**

On July 9, 2020, the Air Force filed a Reply.  See Reply at 1.  The Air Force explains that it has been remediating the Kirtland AFB fuel leak effects since 1999, and it is required to take necessary actions to protect human health and the environment "through the mandatory corrective action provisions of its hazardous waste Permit," which the NM Environment Department issued to it.  Reply at 1.  Equally, the Air Force contends that it, as well as the NM Environment

Department, have expanded resources and continue to follow diligently the Permit process.  See Reply at 1.  Accordingly, the Air Force contends that the Plaintiffs' Complaint is an attack on the Permit provisions and "must be dismissed for a lack of subject matter jurisdiction."  Reply at 1.

Furthermore, as the Air Force argues, although the Plaintiffs assert that they do not have a quarrel with the permit, they are improperly asking the Court to set aside the NM Environment Department's decisions pertaining to the Permit's corrective actions, and to "substitute an alternative process and timeline."  Reply at 1.  This collateral attack, according to the Air Force, is prohibited by Tenth Circuit law, because in Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492, the Tenth Circuit held that, "federal courts do not have jurisdiction over RCRA imminent-hazard lawsuits that challenge permitting decisions of state agencies operating federally-authorized hazardous waste programs under RCRA."  Reply at 2 (citing 111 F.3d at 1492).  In addition, the Air Force disputes the Plaintiffs' argument that Chemical Weapons Working Group v. United States Dep't of the Army is inapplicable.  See Reply at 2 (citing 111 F.3d at 1492).  Specifically, the Air Force contends that the Plaintiffs' argument that the Court distinguish between the permitted activity and the Permit itself, is incorrect, because this is a "distinction without a difference," given that the Air Force's corrective action is considered permitted activity.  Reply at 2 (citing Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492).

The Air Force next disputes the Plaintiffs' arguments that (i) they did not have a meaningful opportunity to challenge the Permit's Corrective Action section during the permitting process,  and (ii) the NM Environment Department did not provide the Plaintiffs adequate notice of the Permit's required corrective actions' scope.  See Reply at 5.  The Air Force states that the Plaintiffs were provided adequate notice, because the NM Environment Department's Fact Sheet, which

accompanied the Permit draft, incorporated the Kirtland AFB by reference on Table 4-2, and, therefore, did provide notice that the Kirtland AFB's leak would be addressed by the Permit's Corrective Actions section.   See Reply at 5.   Moreover, as the Air Force explains, the NM Environment Department even reopened the Permit open comment period in 2010, in response to a request.   See Reply at 5.   The Air Force states that nothing barred the Plaintiffs in this case from making a similar request and utilizing the NM Environment Department's administrative process, which would have offered the Plaintiffs an opportunity for a hearing.   See Reply at 5. Accordingly, the Air Force argues that the "Plaintiffs cannot challenge the Permit via a RCRA citizen suit now, many years after the statute of limitations for direct review of the Permit expired." Reply at 5.   In addition, as the Air Force explains, even if the Plaintiffs did not participate in the Permit review process, the NM Environment Department's administrative Permit modification process remains open to the Plaintiffs and the NM Environment Department can modify permits upon new information from parties.   See Reply, at 6.   Relatedly, the Air Force emphasizes that, under the NMHWA's regulatory structure, the NM Environment Department is responsible for issuing permits, so they should have an opportunity to address any Permit deficiencies. See Reply, at 6.

The Air Force next turns to its argument that the Court should apply the primary jurisdiction doctrine to this case.   See Reply at 6-7.   Specifically, the Air Force states that, since the establishment of New Mexico's first authorized hazardous waste program in 1985, the NM Environment Department has been issuing RCRA permits and has considerable expertise in that area.   See Reply at 6-7.   Under the NM Environment Department's expertise, the Air Force argues that it has been appropriately  "remediating the contamination from the fuel leak" at Kirtland AFB "since it was discovered."   Reply at 6-7.   Furthermore, the Air Force argues that the Plaintiffs'

reliance on <u>Raritan Baykeeper v. NL Indus</u>, 660 F.3d 686, 691 (3rd Cir. 2011), <u>Me. People's</u>

<u>Alliance v. Holtrachem Mfg. Co</u>., 211 F. Supp. 2d 237, and <u>United States v. Hardage</u>, 750 F. Supp.

1460, as evidence that district courts exercise jurisdiction over RCRA claims, is misplaced,

because those cases are specific to their facts.  <u>See</u> Reply at 7.  In addition, as the Air Force

explains, based on the Tenth Circuit's primary jurisdiction factors, there is a danger that the NM

Environment Department and the Court will give conflicting orders, because the information and

evidence that the NM Environment Department considers might not be the same information

presented to the Court.  <u>See</u> Reply at 9. (citing <u>Friends of Santa Fe County v. Lac Minerals</u>, 892

F. Supp. at 1349-50).  Last, the Air Force argues that, because the NM Environment Department

is "more than capable of regulating this corrective action as demonstrated by EPA's authorization

of the state program and the remedial efforts already taken in this case," the Court should defer to

the NM Environment Department and allow the corrective action at Kirtland AFB to proceed.  <u>See</u>

Reply at 11.  Ultimately then, the Air Force concludes by requesting that the Court dismiss the

Plaintiffs' Complaint based on a lack of subject-matter jurisdiction, or alternatively, dismiss the

Complaint pursuant to the primary jurisdiction doctrine.  <u>See</u> Reply at 11.

     **5.**    <u>**The Hearing**</u>.

     The Court held a hearing on July 21, 2020.  <u>See</u> Clerk's Minutes at 1.  The Air Force

opened by summarizing its two central arguments: (i) that the Court should dismiss the Plaintiffs'

Complaint for lack of subject-matter jurisdiction under rule 12(b)(1) of the Federal Rules of Civil

Procedure, because the Plaintiff's Complaint "is an unlawful collateral attack on the Air Force's

state-issued hazardous waste permit," Draft Transcript of Hearing at 9:24-25-10:1 (held July 21,

2020)(Howard)("Tr")[5]; or, alternatively, (ii) the Court should dismiss the Plaintiffs' Complaint

---

     [5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

pursuant to the primary jurisdiction doctrine, because the NM Environment Department is "already overseeing the corrective actions for the very same subject matter of Plaintiffs' Complaint,"  Tr. at 10:5-7 (Howard).  As to the Air Force's latter argument -- the Court's dismissal under the primary jurisdiction doctrine -- the Air Force explained that the Court should dismiss the Plaintiffs' Complaint, because the  "NMED is bound by federal and state regulations to ensure that this corrective action is conducted in a manner protective of human health and the environment."  Tr. at 10:4-10 (Howard).

Responding to the Air Force's opening statement in their opening, the Plaintiffs immediately countered that the problem with the Air Force's position is that, despite the Air Force having discovered the fuel leak at the Kirtland AFB in 1999 -- over twenty years ago -- the "site investigation is not yet complete.  A final remedy for cleanup of soil and groundwater contamination has not yet been selected, let alone implemented."  Tr. 10:25-11:1-2 (De Saillan). First, the Plaintiffs argued that the Court should deny the Air Force's subject matter jurisdiction argument, because the Plaintiffs' Complaint is not a collateral attack on the NM Environment Department Permit.  See Tr. 11:7-12 (De Saillan).  Second, the Plaintiffs argued that the Court should deny the Air Force's argument to dismiss this case pursuant to the primary jurisdiction doctrine because, "the facts, especially the 20 years and counting of investigation, do not favor a set application" of the doctrine.  Tr. 11:13-17 (De Saillan).

Upon the cessation of the Plaintiffs' opening statement, the Air Force outlined its first argument as to the Court's lack of subject-matter jurisdiction.  See Tr. at 12:1-7 (Howard). According to the Air Force, the Court should conclude that the Plaintiffs' imminent-and-substantial endangerment claim under the RCRA's § 7002(a)(1)(B) is an impermissible collateral attack based on the Tenth Circuit's holding in Chemical Weapons Working Group v. United States

Dep't of the Army, 111 F.3d at 1492, where, as the Air Force explained, the Tenth Circuit stated that the RCRA "does not allow collateral attacks on Environment Protection Agency permit decisions or those of state agencies with federally delegated authority."  Tr. at 12:4-7 (Howard). The Air Force also explained that, in addition to the Tenth Circuit's holding, the Fourth Circuit and the Sixth Circuit both have held that "RCRA imminent and substantial endangerment claims are inapplicable to permitted activity."  Tr. at 12:8-11 (Howard).  See Greenpeace, Inc. v. Waste Tech. Industries, 9 F.3d 1174; Palumbo v. Waste Technology Industries, 989 F.2d 156.

Based on these holdings, then, the Air Force continued, the Court should conclude that the Plaintiffs' Complaint is a collateral attack because,

> the Air Force engaged in a corrective action process mandated by the Corrective Action Section of its hazardous waste permit.  And, the Plaintiffs are requesting that this Court enter an order to modify the very items that are already addressed in the permit and this will be accomplished through the remainder of the correction action process being supervised by NMED.  As such, the Plaintiffs' RCRA imminent and substantial endangerment claim directly challenges the Air Force Base-issued hazardous waste permit.  It is unlawful.

Tr. 12:12-25 (Howard).  Relatedly, as the Air Force continued, the Tenth Circuit made clear in Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492 that imminent-and-substantial-endangerment claims under the RCRA's § 7002(a)(1)(B), like the Plaintiffs' claim here, are unlawful under 42 U.S.C. § 6972 because, the claims directly attack permitted activity.  See Tr. 13:12-16.  Problematically, as well, according to the Air Force, here, the Plaintiffs are "attempting to . . . restrain and enjoin" the Air Force's "ongoing permitting process by having" the Court "change the decisions that NMED has already made in the Corrective Action section of the Permit."  Tr. at 13:17-21 (Howard).  Furthermore, the Air Force referenced the fact that the Plaintiffs have many alternative avenues in which to address their grievances with the Permit.  See Tr. 14:1-19.

> The Plaintiffs had the opportunity to raise any concerns that they had with the Corrective Action section of the Permit during their Permit review process.  If the Plaintiffs were dissatisfied with NMED's response, the Plaintiffs could have requested a public hearing followed by an appeal to the New Mexico Court of Appeals to address any remaining concerns.  Additionally, under New Mexico's Hazardous Waste Act, NMED retains the authority to modify, suspend, or revoke any hazardous waste permit it issues in response to challenges or changes and new hazards in the circumstances surrounding the corrective action.  So, Plaintiffs had and they still have NMED's Permit modification process available to them.  However, instead of using New Mexico's administrative processes, the Plaintiffs' brought a complaint in this federal district court alleging RCRA imminent and substantial endangerment exists, such that injunctive relief is required from this Court.

Tr. at 14:1-19 (Howard).

Moreover, as the Air Force emphasized, the Tenth Circuit prohibits the collateral attack that the Plaintiffs are advancing under the RCRA's § 7002(a)(1)(B), 42 U.S.C. § 6971(a)(1)(B), because exercising jurisdiction over a lawsuit of this nature would:

> allow plaintiffs to circumvent the carefully crafted process in New Mexico's Hazardous Waste Act that allows the NMED to make decisions that are relevant to the cleanup of any contamination from hazardous waste fields in that state.  Granting jurisdiction would severely undermine the judicial review of the agency permit decisions that is provided under RCRA, as well as under the New Mexico Hazardous Waste Act.

Tr. at 14:20-25 (Howard).  This case is no different, as the Air Force explained, because, in advancing the lawsuit, the Plaintiffs are "simply trying to circumvent the NMED's carefully crafted permit section as well as the permit review and modification processes."  Tr. at 14:26-29 (Howard).  According to the Air Force, the Plaintiffs' attempt to "circumvent" the "permit review and modification processes" is "shown by the Plaintiffs' failure to mention . . . in their Complaint that the permit even exists."  Tr. at 15:5-11 (Howard).  Accordingly, as the Air Force concluded, "if this Court finds jurisdiction exists in this case, it will render the permit appeal and modification procedures meaningless," and, in the future, "[i]nterested parties could just avoid the limited statute of limitations for permit appeals, the entire permit modification process, and the state

mandated direct appeal to the New Mexico Court of Appeals, including the deferential standard of review that favors administrative agency actions." Tr. at 15:18-16:1 (Howard).  This avoidance is why, as the Air Force added, "the Tenth, Sixth, and Four Circuits have all found that federal courts lack jurisdiction for losses concerning imminent hazard claims addressed in federal and state-issued hazardous waste permits."  Tr. at 16:2-5 (Howard).

The Plaintiffs first responded to the Air Force's collateral attack argument, stating that the argument is flawed for several reasons.  See Tr. at 17:24-18:8 (Howard).  First, as the Plaintiffs explained, "this lawsuit is not an attack on permits," and the Plaintiffs "have no quarrel with the permit" that the NM Environment Department issued, which is why the "permit is not referenced in the Complaint."  Tr. at 18:10-16 (De Saillan).  Second, as the Plaintiffs continued, this case should be distinguished from Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492, because, in that case, the plaintiffs "argued that the incineration itself would present an imminent substantial endangerment.  In other words, the permitted activity.  So, the Court found that they were effectively attacking the permit."  Tr. at 18:17-25 (De Saillan). Furthermore, the Plaintiffs contend that the Tenth Circuit "made this distinction clear" that the Plaintiffs were attacking the "permitted activity," as opposed to the permit itself,  when stating: "'Plaintiffs concede that the only consequence of their suit would be to enjoin the Army's operations at the facility entirely.  That being the case, plaintiff's claim is extinguishable from other attempts to enjoin the issuance of the Army's Resource Conservation and Recovery Act permit.'"  Tr. at 19: 3-9(Howard)(quoting Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492).  Chemical Weapons Working Group v. United States Dep't of the Army, therefore, as the Plaintiffs explained, is different than their current lawsuit, because here, they are not seeking to enjoin the Air Force's permitted operation at all.  See Tr. at 19:5-10

(Howard)(citing 111 F.3d at 1492).   Instead, the Plaintiffs allege: "[The Air Force's] open

detonation, the permitted activity, could continue as before.  The permit could not be affected.  So,

this lawsuit is not an attack on the permit or the permitted activity."  Tr. at 19:11-16 (De Saillan).

The Plaintiffs then addressed a third reason that the Air Force's argument is flawed,

explaining that, "[f]or this case to be a collateral attack on the permit, there first needs to have been

an opportunity for the plaintiff to have challenged the corrective action requirements directly in

the permit proceedings."  Tr at 19:18-24 (De Saillan).  Furthermore, as the Plaintiffs emphasized,

despite the Air Force alleging  that the Plaintiffs have had an opportunity to challenge the

corrective action requirements, "they have not -- they did not have that opportunity."  Tr. at 19:21-

25.  The Plaintiffs explained that the reason that they did not have an opportunity to challenge the

NM Environment Department Permit's corrective action requirements was because

> it was only on April 2, 2010, three years after the public comment period, that the
> Environment Department sent two letters to the Air Force.  The letters stated that,
> henceforth, oversight of the bulk fuel facility would be handled under the hazardous
> waste permit rather than under the groundwater abatement program of the Water
> Quality.  So those letters were sent, as I said, three years after close of the public
> comment period on the permit.  And there was no public notice announcing that
> decision.
>
> And then, on July 15, 2010, the Environment department issued the renewed
> hazardous waste permit that we're dealing with her.  The permit was just to the Air
> Force for open detonation at Kirtland Air Force Base.  The only notice of issuance
> of that permit went to the air Force and to the persons who had commented on the
> draft permit back in 2007.  So, at the time that the public was allowed to comment
> and request a hearing on the draft hazardous waste permit, the Environment
> Department was not addressing the bulk fuel facility under that permit or under the
> Hazardous Waste Act.  So, the public, including the Plaintiffs, had no notice and
> no way of knowing that that approach was going to change in the future.  So, they
> had really no opportunity to comment on the bulk fuel facility and the context of
> the permit."

Tr. at 21:2-22:1 (De Saillan).

The Plaintiffs also made certain to clarify for the Court that, although, as the Air Force

mentioned in their Reply, there had been a second public comment period on the draft Permit in

2010:

> that comment period was limited to a very specific issue.  There had been some
> controversy over a pipeline that was crossing a landfill at Kirtland Air Force Base.
> The Environment Department accepted, in 2010, comments on that particular issue,
> and only on that particular issue.  Not on anything else.  So again, there was no
> opportunity at the time that this permit was put out for the public to actually
> meaningfully comment on the corrective action.  It was being done under another
> program.

Tr. at 22:4-18 (Howard).

The Plaintiffs then transitioned to discussing the final flaw with the Air Force's collateral

attack argument, which they stated relates to the "amount of time that's elapsed since the permit

was issued."  Tr. at 22:19-21 (De Saillan).  Specifically, as the Plaintiffs explained:

> The Environment Department issued the hazardous waste permit ten years
> ago, and the comment period on the draft permit was 17 years ago, in 2007.  And
> furthermore, the Permit was never intended to remain in place for ten years.  On its
> face, the 2010 permit was to expire after three years, in August of 2013.  The Air
> Force submitted an application to the Environment Department for a renewed
> permit on -- actually in 2014, the Air Force got a couple of extensions of time on
> the application.
>
> Now, if the Environment Department had acted only on that Permit renewal
> application back in 2014, the public, including the Plaintiffs, would have had an
> opportunity to comment on that permit and request a hearing on that Permit.  The
> Environment Department never acted on the Permit application.
>
> Under the regulations, the Permit renewal application was submitted on
> time, and the old permit remains in effect until the Environment Department acts
> on this application.  So, the 2010 permit has remained in effect for another seven
> years without any opportunity for public scrutiny.  And it can continue in effect
> indefinitely until the Environment Department acts on this Permit application.

Tr. at 23:8-21 (De Saillan)

Given this lapse of time, then, as the Plaintiffs explained, the Plaintiffs' argument here is

different from the plaintiffs' argument in Chemical Weapons Working Group v. United States

Dep't of the Army, 111 F.3d at 1492, because, in "that case, the plaintiffs brought an imminent

hazard action challenging the incineration immediately after the permit was issued.  Not ten years later.  So, the collateral bar on RCRA citizen suits cannot last indefinitely.  Circumstances change.  And they have changed here."  Tr. at 23:22-24:5 (De Saillan).   Furthermore, as the Plaintiffs continued, in this case, they have been "very patient" in waiting on the Air Force to implement the requisite corrective actions under the Permit; nonetheless, "[t]en years of not completing the investigation was very troubling.   But twenty years of not completing the investigation is intolerable."  Tr. at 24:6-9 (De Saillan).

Upon the conclusion of the Plaintiffs' arguments, the Court interjected to ask the Plaintiffs if <u>Chemical Weapons Working Group v. United States Dep't of the Army</u> was "dealing with the same sections" of the RCRA that the Court was currently reviewing, meaning, the Court would not be "free as a district court to distinguish this case."  Tr. at 25:1-4 (Court)(citing <u>Chemical Weapons Working Group v. United States Dep't of the Army</u>, 111 F.3d at 1492).  The Plaintiffs conceded that, although the Tenth Circuit was dealing with the RCRA's § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B) -- the same sections that the Court is reviewing here -- the Tenth Circuit was "dealing with very different facts."  Tr. at 25:5-7 (De Saillan).  The Court then questioned how it could distinguish the facts between both cases, so it does not disregard Tenth Circuit precedent prohibiting collateral attacks under the RCRA's § 7002(a)(1)(B), 42 U.S.C. 6972(a)(1)(B).  The Court stated:  "And how would I, being a faithful district judge to the Tenth Circuit's precedent, how would I write in one sentence, three sentences, a paragraph that this case doesn't bind me and require me to decline jurisdiction?"  Tr. at 25:8-12 (Court).  The Plaintiffs responded by stating that the Court could distinguish the cases, because, unlike in <u>Chemical Weapons Working Group v. United States Dep't of the Army</u>: (i) "this lawsuit is not an attack on the permit," Tr. at 24:10-12 (De Saillan); (ii) "the plaintiffs did not have an opportunity to comment or request a hearing on

the corrective action provisions of the 2010 permit, as they relate to the bulk fuel facility," Tr. at

24:13-16 (De Saillan); and (iii) "too much time has elapsed since the permit proceedings," given

that the "public comment period on the draft permit ended 13 years ago . . . .  The permit itself was

issued ten years ago . . . [a]nd the permit was set to expire seven years ago," Tr. at 24:17-21 (citing

Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492).

The Court then asked the Air Force what the Plaintiffs could do in the scenario that the

Court cannot exercise subject-matter jurisdiction over the Plaintiffs' Complaint.  See Tr. at 27:2-

6 (Court).  The Air Force subsequently outlined the various redress avenues that the Plaintiffs can

pursue if the Court dismisses on subject-matter-jurisdiction grounds.  See Tr. at 27:7 - 28:10

(Howard).

> [I]f they don't come to federal court, they follow the procedures in the New Mexico Hazardous Waste Act that discuss bringing issues of this nature to NMED for NMED to then consider the information and make whatever modifications are necessary to the permit.  And, that is not limited by any timeframe.  Any new information that the Plaintiffs have, they can give it to the New Mexico Environment Department to review at any point in time, even with regard to judicial review in the New Mexico Appellate Court.  If they have new information, they're able to present that information regarding the Permit in New Mexico's Appellate Court, after the 20-day timeframe has lapsed.  So, the Plaintiffs could have gone to NMED and presented to it the concerns that they have, demonstrate that there is an imminent hazard that requires modification of the Permit, and NMED could make those modifications if NMED deems them necessary.  If NMED does not deem them necessary, then the Plaintiffs could go to the New Mexico Appellate Court and seek review there, because that would be a final agency action that entitles them to review in New Mexico's Appellate Court under the Hazardous Waste Act.  Or, if plaintiffs have additional information about an imminent hazard that would impact the current Permit's operation, they could go to New Mexico's Appellate Court with that information as it is new information, and they would not be precluded by the 20-day statute of limitations.

Tr. at 27:7-28:10 (Howard).  Finally, as the Air Force explained, if the Plaintiffs wishes to dispute

the Permit provisions themselves -- the provisions dictating the cleanup -- then the Plaintiffs should

have brought their case under the RCRA's 7002(a)(1)(A), 42 U.S.C. § 6972 (a)(1)(A), "which is

how you dispute issues with the actual permit."  Tr. at 33:8-9 (Howard).

The Air Force then emphasized to the Court that the Plaintiffs' contention that they are not attacking the Permit is inaccurate.  See Tr. at 29:2-6 (Howard).  The Plaintiffs' contention is inaccurate, according to the Air Force, because the Plaintiffs are attacking the "permitted activity" under the NM Environment Department Permit -- which "is the corrective action," and the "Permit" and the "permitted activity" are "one and the same."  Tr. at 29:2-6 (Howard). Accordingly, the Air Force explained that the Plaintiffs

> cannot ask for this court to enter an injunction to modify aspects of the corrective action that is ongoing at Kirtland Air Force Base without impacting the permit provisions, because that is what the Air Force is using to effectuate this cleanup. So, to say that they are not attacking the permit is factually incorrect in the sense that they are trying to make a distinction between two things that really don't have any difference, because the open detonation activity that they're talking about is permitted activity, just like the corrective action activity is permitted activity.
>
> So here, we are talking about permitted activity.  If you look at the actual permit, one of the biggest sections of the permit is the Corrective Action section. So, to try to say that this is not a permitted activity is incorrect.

Tr. at 29:19-23 (Howard).

The Court turned subsequently to the Air Force's second argument that the Court should, alternatively, dismiss the case pursuant to the primary jurisdiction doctrine.  See Tr. at 35:14-16 (Court).   The Air Force opened first with their arguments to support the Court's application of the primary jurisdiction doctrine, stating that the Tenth Circuit's primary jurisdiction doctrine factors, as Friends of Santa Fe Country vs. Lac Minerals lays out, support the Court's deference to the NM Environment Department's regulatory authority in this case.    See Tr. at 35:23-25 (Howard)(citing Friends of Santa Fe Country vs. Lac Minerals, 892 F. Supp. at 1349 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d at 1376-77)).  Accordingly, under the Tenth Circuit primary jurisdiction factors, as the Air Force explained, the Court should defer to the NM

- 43 -

Environment Department in this case, because

> the ongoing corrective action that the Air Force is diligently pursuing under NMED's supervision, coupled with the subject matter of the complaint and the type of relief plaintiffs are requesting weigh in favor applying the doctrine of primary jurisdiction.
>
> While this Court is competent to hear cases with highly technical and scientific material like the subject of this case, the plaintiff acknowledges in their response int his case are within the expertise of NMED. NMED has been supervising their remedial efforts pertaining to the cleanup of the bulk fuel facility leak since it started. And NMED ensures that this ongoing corrective action is conducted in a manner protective of human health and the environment . . . .
>
> [P]laintiffs are requesting injunctive relief that requires scientific or technical expertise. And that's the same relief that NMED could grant through its administrative process. As the Tenth Circuit noted, "claims for injunctive relief requiring scientific or technical expertise are not routinely heard by federal courts . . . If the Court retains this case and grants the relief requested by the plaintiff, there is a high likelihood that there will be conflicting orders because the relief that plaintiffs are requesting is directed at the remaining set of corrective action process articulated in this permit.

Tr. at 36:2-24 (Howard)(citing Friends of Santa Fe Country vs. Lac Minerals, 892 F. Supp. at 1349

(citing Marshall v. El Paso Natural Gas Co., 874 F.2d at 1376-77)).

The Plaintiffs responded subsequently to the Air Force's argument that the Court should

apply the primary jurisdiction doctrine in this case. See Tr. at 45:2-7 (De Saillan). First, although

the Plaintiffs conceded that courts have applied the primary jurisdiction doctrine, the Plaintiffs

contended that,

> more often, they have not applied the primary jurisdiction doctrine in RCRA cases specifically because they found . . . that in enacting the RCRA and in enacting the citizens-suit provision of the RCRA, Congress intended that the courts exercise jurisdiction over this type of case. . . . There is some tension there between applying primary jurisdiction and the clearly expressed intent of Congress. And, so, for the most part, the courts have said, no, we're not going to apply primary jurisdiction here; we're going to exercise jurisdiction as Congress intended.

Tr. at 45:2-16 (De Saillan)(citing United States v. Hardage, 750 F. Supp. 1460 (W.D. Okla.

1990)(Phillips, J.), aff'd on other grounds 982 F.2d 1436 (10th Cir. 1992); Me. People's Alliance

v. Holtrachem Mfg. Co., 211 F. Supp. 2d 237 255-56 (D. Me. 2002)(Carter, J.), aff'd sub nom.

Me. People's Alliance v. Mallinckrodt, Inc., 471 F.2d 277 (1st Cir. 2006)).

 The Plaintiffs then proceeded to make three points why primary jurisdiction does not apply

here under the Tenth Circuit primary jurisdiction factors. See Tr. at 45:17-25 (De Saillan). See

also Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349-50 (citing Marshall v.

El Paso Natural Gas Co., 874 F.2d at 1376-77). First, the Plaintiffs argued that, despite the Air

Force's contention that the case involves highly technical issues that the Court is not well suited

to address, the issues are "not terribly complicated and they're not terribly difficult to understand."

Tr. at 46:1-5 (De Saillan). Furthermore, as the Plaintiffs continued, "the parties here have

technical experts that can assist the Court in fashioning a remedy and in understanding the issues.

If the Court finds it necessary, the Court can also appoint a special master, which we certainly

would not oppose." Tr. at 46:5-8 (De Saillan).

 The Plaintiffs then returned to their Congressional intent argument, arguing that, "when

Congress enacted the citizens-suit provision of the RCRA, it intended for courts to address these

kinds of issues. . . . [And] courts have, in fact, ordered remedies in RCRA cases and in analogous

cases under CERCLA, the Comprehensive Environment Response Compensation Liability Act."

Tr. at 46:12-20 (De Saillan). Next, the Plaintiffs argued that, despite the Air Force's contention

that the Court could potentially issue an order that is in conflict with, or inconsistent with a NM

Environment Department order, "the likelihood of that actually happening is really quite small,"

because "the Plaintiffs are in communication with the Environment Department," and the "Air

Force is also in communication with the Environment Department." Tr. at 47:1-6 (De Saillan).

Furthermore, the Plaintiffs speculated that the Environment Department would participate in

settlement negotiations or in crafting a final order, and it "certainly would be possible for the Court

to issue a draft order to make sure to determine the terms of the discussion earlier, to make sure

that the Court gets it right."  Tr. at 47:5-10 (De Saillan).

Last, the Plaintiffs disputed the Air Force's contention that the NM Environment

Department has already initiated corrective actions pursuant to the NM Environment Permit.  See

Tr. at 47:14-19 (De Saillan).  The Plaintiffs referenced several examples to support that the NM

Environment Department has not initiated corrective actions:

> First of all, the RCRA facility investigation report. . . .  [T]he Air Force . . . initially submitted a report back in 2014.  The Environment Department didn't find it acceptable so the Air Force withdrew that report.  It was actually a two-volume report.

> Then, three years later, the Air Force submitted another RCRA facility investigation report.  The Environment Department was again not satisfied with it, and issued a couple of what it called notices of deficiency.

> In addition, the Albuquerque Bernalillo County Water Utility Authority issued its own report that was highly critical of the 2017 RCRA Facility Investigation Report that the Air Force submitted.  So then, in August of 2018, the Air Force again submitted a new version of the RCRA Facility Investigation Report.  And, it's been now two years, since August of 2018, when that report was submitted.  It has yet to be approved by the Environment Department.

> Another example . . . is back in 2010, ten years ago, when the Environment Department transferred regulatory authority over this matter form the Groundwater Quality Bureau to the Hazardous Waste Bureau, the Environment Department expressed its displeasure and frustration at the pace of the Air Force's efforts.  The Chief of the Groundwater Bureau stated in one later -- and this is a letter dated April 2, 2010, and I'll quote, "Kirtland Air Force Base has not complied with the requirements of the Groundwater Quality Bureau's first and second notices of deficiency."  This was under the Water Quality Act.  "Kirtland Air Force has failed to provide an interim work plan with specific dates for task completion or a revised timeline that provides for the investigation and abatement of off-based prudence in a reasonable timeframe."   New Mexico Environment Department Letter to Air Force Re: Kirtland AFB Stage 2 Abatement Plan, SS-111 and ST-106 Bulk Fuel Facility Fuel Spill, dated April 2, 2010 at 1-2, filed May 26, 2020, (Doc. 21-2)("Stage 2 Abatement Plan Letter")

> At the same time, on the same date, April 2, 2010, the Chief of the Hazardous Waste Bureau sent a letter.  And he stated: "Despite the fact that this release of hazardous constituents was first discovered ten years ago, the Air Force

> has not completely characterized the bulk fuel facility spill not conducted adequate remediation."  New Mexico Environment Department Letter to Air Force Re: Solid Waste Management Units St-106 and SS-111, Bulk Fuel Facility Spill, dated April 2, 2010, at 1-2, filed May 26, 2020, (Doc. 21-2)("Solid Waste Management Units Letter").

> It has now been twenty years . . . since the Air Force announced the existence of the leak.  But the Air Force still has not completely characterized the bulk fuel facility spill nor conducted adequate remediation.

Tr. at 47:20-49:24 (De Saillan).  Ultimately then, the Plaintiffs concluded that this "case all but cries out for judicial supervision."  Tr. at 49: 24-25 (De Saillan).

The Air Force responded subsequently to the Plaintiffs' arguments against the Court's application of the primary jurisdiction doctrine.  See Tr. at 50:16-25 (Howard).  First, the Air Force stated that, despite the Plaintiffs' reference to district courts choosing to exercise jurisdiction over RCRA claims, this case's facts are very different from those cases circumstances, thus, supporting the Court's application of the primary jurisdiction doctrine here.  See Tr. at 50:18-22 (Howard)(citing United States v. Hardage, 750 F. Supp. 1460; Me. People's Alliance v. Holtrachem Mfg. Co., 211 F. Supp. 2d at 255-56).  Specifically, as the Air Force explained:

> In those cases, there was not a corrective action process that had been started, and unlike here, there was no supervision of the state agency that was appointed to oversee those types of matters. . . . [T]hat is significant, because of the type of subject matter in this case.  When we look at the information required to drive this corrective action process that deals with hazardous waste, NMED's expertise is invaluable.  And as you see, the Plaintiffs offer the Court a suggestion of consulting with NMED in order to facilitate orders in this case.  That suggestion shows how important NMED is to this process.

Tr. at 50:20-51:11 (Howard).

The Air Force next emphasized that, despite the Plaintiffs' contention that the NM Environment Department was not adequately regulating the Air Force, "in fact, in the RCRA permit there is an opportunity for NMED to use administrative means to actually enforce the Permit."  Tr. at 51:18-20 (Howard).  In addition, as the Air Force emphasized further, the NM

Environment Department has an "option to bring a case against the Air Force if necessary when compliance and administrative level actions do not bring about the desired impact."  Tr. at 51:20-25 (Howard).  Accordingly, as the Air Force explained,

> having a case in federal district court where we have an agency like the New Mexico Environment Department who has the expertise required to fully regulate and oversee this corrective action is not necessary.  And the doctrine of primary jurisdiction is there to allow courts to grant these agencies the ability to continue their regulatory effort, and not subject the regulated entities to a federal court proceeding, as well as regulatory efforts from a regulatory agency.

Tr. at 51:2452:8 (Howard).

Finally, the Air Force stated that the Court should defer to the NM Environment Department in this matter, because the NM Environment Department "is taking the steps necessary to ensure that this corrective action is diligently pursued."  Tr. at 52:10-11 (Howard).  Importantly, as well, as the Air Force outlined, the Air Force "has made progress in the corrective action," and "the Permit shows exactly where the corrective action is going to go, and their plans for this corrective action to be continued until a final remedy is in place."  Tr. at 52:12-17.  Accordingly, the Air Force requested that the Court apply the primary jurisdiction doctrine and dismiss the case.  See Tr. at 52:22-23.

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986); United States v. Nixon, 418 U.S. 683 (1974); Tafoya v. U.S. Dep't of Justice, Law Enf't Assistance Admin., 748 F.2d 1389, 1390 (10th Cir. 1984)).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S.

83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). Because "federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999). Rule 12(b)(1) allows a party to raise, by motion, the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1).

The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002). On a facial attack, a plaintiff enjoys safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897 (1981). But when the attack is factual,

> a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(citations omitted). See World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1086-87 (D.N.M. 2019)(Browning, J.). Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9 (D.N.M. March 11, 2009)(Browning, J.), aff'd on other grounds by 634 F.3d 1170 (10th Cir. 2011). The United States Court of Appeals for the Fifth Circuit has stated:

"[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.

56.   Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -
- its very power to hear the case -- there is substantial authority that the trial court
is free to weigh the evidence and satisfy itself as to the existence of its power to
hear the case.   In short, no presumptive truthfulness attaches to plaintiff's
allegations, and the existence of disputed material facts will not preclude the trial
court from evaluating for itself the merits of jurisdictional claims."

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court.   See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).   In

those instances, a court's reference to evidence outside the pleadings does not necessarily convert

the motion to a rule 56 motion for summary judgment.   See Holt v. United States, 46 F.3d at 1003

(citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).   Where, however, the court

determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's

merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.   See Franklin Sav.

Corp. v. United States, 180 F.3d at 1129; Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir.

1997).   "When deciding whether jurisdiction is intertwined with the merits of a particular dispute,

'the underlying issue is whether resolution of the jurisdictional question requires resolution of an

aspect of the substantive claim.'"   Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296

(10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th

Cir. 2002)).   "When subject-matter jurisdiction is dependent upon the same statute which provides

the substantive claim in the case, the jurisdictional claim and the merits are considered to be

intertwined."   Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *9

(D.N.M. March 30, 2009)(Browning, J.)(citing Wheeler v. Hurdman, 825 F.2d at 259; Holt v.

United States, 46 F.3d at 1003).

## RELEVANT  LAW REGARDING SUBJECT-MATTER JURISDICTION

It is a fundamental precept of American law that the federal courts are 'courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331, 1332.

Pursuant to rule 12(h)(3) of the Federal Rules of Civil Procedure, "[i]f the court determines at any time that it lack subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Objection to a federal court's subject-matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  See Kontrick v. Ryan, 540 U.S. 443, 455 (2004)("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)(holding that the nature and limits of federal judicial power require the court to raise the issue of subject-matter jurisdiction sua sponte).

Whenever the court lacks jurisdiction of the subject matter involved in an action, the court must dismiss the action.  See Tuck v. United States Auto. Ass'n, 859 F.2d 842, 844 (10th Cir. 1988).  The party seeking the exercise of jurisdiction bears the burden of establishing jurisdiction and "must allege in his pleading the facts essential to show jurisdiction."  United States ex rel.

General Rock & Sand Corp. v. Chuska Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995)(citation and internal quotations omitted).  In determining whether a party has adequately presented facts sufficient to establish jurisdiction, the court should look to the complaint's face, see Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972), accepting the well-pleaded factual allegations as true, see United States v. Rodriguez-Aguirre, 264 F.3d 1195, 1203 (10th Cir. 2001), but ignoring conclusory allegations of jurisdiction, see Groundhog v. Keeler, 442 F.2d 674, 677 (10th Cir. 1971).  "[D]ismissals for lack of jurisdiction should be without prejudice because the court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying claims."  Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006)(emphasis in original).

## LAW REGARDING ABROGATION

Where Congress has acted to invade an area of law that federal common law formerly occupied, the Court's role in lawmaking is limited.  See City of Milwaukee v. Illinois, 451 U.S. 304, 314 (1981).  "It is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law."  City of Milwaukee v. Illinois, 451 U.S. at 317.  "Where the issues raised require the expertise of administrative agencies, federal courts often decline to exercise the jurisdiction and refuse to hear the claim based on the doctrine of primary jurisdiction."  Tampa Interstate 75 Ltd. P'ship v. Fla. Gas Transmission, 294 F. Supp. 2d 1277, 1279 (M.D. Fla. 2003).

## ANALYSIS

Under rule 12(b)(1) of the Federal Rules of Civil Procedure, a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim.  See Fed. R. Civ. P. 12(b)(1). Statutes conferring jurisdiction must be strictly construed.  See Grosvenor v. Qwest Corp., 733 F.

3d 990, 995 (10th Cir. 2013).  Rule 12(b)(1) motions to dismiss may be either a facial attack or a factual attack.  See Ingram v. Faruque, 728 F.3d 1239, 1242 (10th Cir. 2013); Stuart v. Colo. Interstate Gas Co., 271 F.3d 1221, 1225 (10th Cir. 2001); Holt v. United States, 46 F.3d at 1002-03.  "Where the party challenging subject-matter jurisdiction mounts a facial attack, 'the district court must accept the allegations in the complaint as true.'"  Ingram v. Faruque, 728 F.3d at 1242 (citing Stuart v. Colo. Interstate Gas Co., 271 F.3d at 1225).  If the challenging party brings a factual attack, as the Air Force does here, by "'go[ing] beyond allegations contained in the complaint and challeng[ing] the facts upon which subject matter jurisdiction is based . . . [the] court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts.'"  Ingram v. Faruque, 728 F.3d at 1242 (quoting Stuart v. Colo. Interstate Gas Co., 271 F.3d at 1225).  Moreover, "[i]n addressing a factual attack, the court does not 'presume the truthfulness of the complaint's factual allegations.'"  United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547 (10th Cir. 2001)(quoting Holt v. United States, 46 F.3d at 1002).

The Court grants the Air Force's MTD.  The Court concludes, first, that it does not have subject-matter jurisdiction over the Plaintiffs' imminent-and-substantial endangerment claim under the RCRA's § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), because, under Tenth Circuit law, the lawsuit is an impermissible collateral attack on the corrective measures that the Air Force is performing to address the Kirkland AFB spill, pursuant to the NM Environment Permit.  See Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.  Second, and in the alternative, the Court dismisses the case pursuant to the primary jurisdiction doctrine, and, thus, defers to the NM Environment Department's administrative oversight in the case, because under Tenth Circuit law: (i) the case's factual issues are within the NM Environment

Department's expertise; (ii) if the Court were to exercise jurisdiction over this matter, the Air Force could be subjected to conflicting orders from the Court and the NM Environment Department; (iii) the Air Force and the NM Environment Department have already initiated and diligently pursued pertinent agency actions; and (iv) the injunctive relief that the Plaintiffs seek requires scientific or technical expertise.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349-51. Accordingly, the Court grants the Air Force's MTD.

I.      **THE COURT LACKS SUBJECT-MATTER JURISDICTION, BECAUSE THE PLAINTIFFS' IMMINENT-AND-SUBSTANTIAL-ENDANGERMENT RCRA SUIT, PURSUANT TO THE RCRA'S § 7002(a)(1)(B), IS AN IMPERMISSIBLE COLLATERAL ATTACK ON THE NM ENVIRONMENT DEPARTMENT'S PERMIT ISSUED TO THE AIR FORCE IN JULY, 2010, GIVEN THAT (i) THE AIR FORCE IS ALREADY OPERATING PURSUANT TO THE NM ENVIRONMENT DEPARTMENT'S PERMIT THAT ADDRESSES THE ALLEGED IMMINENT HAZARD THE KIRTLAND AFB LEAK CAUSED; AND (ii) THE RCRA'S § 7002(a)(1)(B) IS NOT INTENDED TO AUTHORIZE CITIZEN SUITS AGAINST PEOPLE OR ENTITIES OPERATING PURSUANT TO VALID <u>RCRA PERMITS</u>.**

The Court first addresses whether the RCRA's § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), grants a district court jurisdiction to consider a citizen suit claiming that the Air Force, by operating within the limits of its valid RCRA permit issued by the NM Environment Department, may, nonetheless, present an "imminent and substantial endangerment to health or the environment" as required for the Plaintiffs to bring a proper citizen suit.  42 U.S.C. § 6972(a)(1)(B).  Since July, 2010, and continuing into the present, the NM Environment Department regulates the Air Force's corrective actions to address cleanup and effects of the Kirtland AFB leak, pursuant to the corrective action provisions in the NM Environment Department's Permit.  See Complaint  ¶¶ 38-39, at 12-13; RCRA Facility Investigation Report ¶ 1, at 2.  See also MTD at 1.  Although the Plaintiffs contend that they "have no quarrel with the permit," Response at 12, in their Complaint, the Plaintiffs, nonetheless, allege that, pursuant to the RCRA's § 7002(a)(1)(B), the "Air Force is liable for injunctive relief to take action to abate the endangerment to health and the environment"

- 54 -

that the Kirtland AFB leak caused.  Complaint ¶ 50, at 14 (citing 42 U.S.C. § 6982(a)(1)(B)).

Pursuant to the Air Force's alleged liability under the RCRA's § 7002(a)(1)(B), the Plaintiffs, in

turn, request that the Court "enjoin[] the Defendant to take action to abate the imminent and

substantial endangerment to health and the environment according to a reasonable but aggressive

schedule ordered by this Court."  Complaint at Prayer for Relief, ¶ 1, at 15.  See 42 U.S.C. §

6982(a)(1)(B).    The  Air  Force  counters  that  the  Plaintiffs'  imminent-and-substantial-

endangerment lawsuit under RCRA § 7002(a)(1)(B) is an impermissible collateral attack, because

the Plaintiffs are "asking this Court to set aside the decisions NMED made regarding corrective

action and to substitute an alternative process and timeline," which Tenth Circuit precedent bars.

Reply at 1.  Ultimately, under Tenth Circuit law, the Court concludes that it lacks subject-matter

jurisdiction to preside over the Plaintiffs' RCRA suit, pursuant to the RCRA's § 7002(a)(1)(B),

because the imminent-and-substantial-endangerment RCRA suit is a collateral attack on the NM

Environment Department Permit issued to the Air Force, given that (i) the Air Force is operating

currently within the regulations imposed by the NM Environment Department's Permit to address

the effects of the fuel leak that was discovered in 1999 -- the imminent hazard that the Plaintiffs

allege in this suit -- and; (ii) RCRA's § 7002(a)(1)(b) is not intended to authorize citizen suits

against  people  or  entities  operating  pursuant  to  valid  RCRA  permits.   See  42  U.S.C. §

6982(a)(1)(B).

The "RCRA is the comprehensive Environment statute that governs the treatment, storage,

and disposal of solid and hazardous waste." Meghrig v. KFC Western., Inc., 516 U.S. 479, 483,

(1996)(citing Chicago v. Environment Defense Fund, 511 U.S. 328, 331-332 (1994)).  Unlike

other comprehensive Environment laws, such as the Comprehensive Environment Response,

Compensation, and Liability Act of 1980 ("CERCLA"), 94 Stat. 2767, as amended, 42 U.S.C. §

9601, however, the "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of Environment hazards." Meghrig v. KFC Western., Inc., 516 U.S. at 483.   Rather, the RCRA's primary purpose "is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Meghrig v. KFC Western., Inc., 516 U.S. 479, 483 (quoting 42 U.S.C. § 6902(b)).   Pursuant to its primary purpose, the RCRA mandates that "each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste . . . have a permit issued" pursuant to 42 U.S.C. § 6925. 42 U.S.C. § 6925(a).   In turn, RCRA-issued permits must contain sufficient terms and conditions to protect human health and the environment, see 40 C.F.R. § 270.32(b)(2); N.M.S.A. § 74-4-4.2(C), and must require "corrective action for all releases of hazardous waste . . . from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit. . . ." 42 U.S.C. § 6924(u).  See N.M.S.A. § 74-4-4.2(B).  Under the RCRA, a facility's requisite corrective action must extend beyond the facility's boundary "where necessary to protect human health and the environment."   42 U.S.C. § 6924(v); 40 C.F.R. § 264.101(c); N.M.S.A. § 74-4-10(E).   New Mexico's approved hazardous waste program defines "corrective action" as "action taken in accordance with [state rules] to investigate, minimize, eliminate or clean up a release to protect the public health, safety, and welfare of the environment."  N.M.S.A. § 74-4-3(C).

In addition, although "[c]hief responsibility for the implementation and enforcement of [the] RCRA rests with the Administrator of the Environment Protection Agency ("EPA")," Meghrig v. KFC Western, Inc., 516 U.S. at 483 (citing 42 U.S.C.  §§ 6928, 6973), the RCRA allows the EPA to assist and authorize states in the development of their own hazardous waste

programs, see 42 U.S.C. § 6926(a)-(b).  Section 6926(b) provides:

>    **(b)     Authorization of State program**
>
>        Any State which    seeks    to    administer    and    enforce    a hazardous
>    waste program pursuant to this subchapter may develop and, after notice and
>    opportunity for public hearing, submit to the Administrator an application, in such
>    form as he shall require, for authorization of such program. Within ninety days
>    following    submission    of    an    application    under    this    subsection,
>    the Administrator shall issue a notice as to whether or not he expects such program
>    to be authorized, and within ninety days following such notice (and after
>    opportunity for public hearing) he shall publish his findings as to whether or not
>    the conditions listed in items (1), (2), and (3) below have been met. Such State is
>    authorized to carry out such program in lieu of the Federal program under this
>    subchapter    in    such    State and    to    issue    and    enforce    permits    for
>    the storage, treatment, or disposal of hazardous  waste (and  to  enforce  permits
>    deemed to have been issued under section 6935(d)(1) of this title) unless, within
>    ninety days following submission of the application the Administrator notifies
>    such State that such program may not be authorized and, within ninety days
>    following such notice and after opportunity for public hearing, he finds that (1)
>    such State program is not equivalent to the Federal program under this subchapter,
>    (2) such program is not consistent with the Federal or State programs applicable in
>    other States, or (3) such program does not provide adequate enforcement of
>    compliance with the requirements of this subchapter.  In authorizing a State
>    program, the Administrator may base his findings on the Federal program in effect
>    one year prior to submission of a State's application or in effect on January 26,
>    1983, whichever is later.

42 U.S.C. § 6926(b).

Accordingly, any action taken by a state under an authorized hazardous waste program has

"the same force and effect" as an action taken by the EPA pursuant to the RCRA.  See 42 U.S.C.

§ 6926(d).  New Mexico operates an EPA-authorized program under the New Mexico Hazardous

Waste  Act  of  1978  ("NMHWA"),  N.M.S.A.  §§  74-4-1  to  74-4-17,  and  its  implementing

regulations, see 40 C.F.R. § 272.1601.

As parallel to the federal RCRA's purpose, the NMHWA's purpose is to "help ensure the

maintenance of the quality of the state's environment; to confer optimum health, safety, comfort

and economic and social well-being on its inhabitants; and to protect the proper utilization of its

lands."  N.M.S.A.  §  74-4-2.  Accordingly, pursuant to the NMHWA, and for the purpose of

enforcing the Hazardous Waste Act and its regulations, the NM Environment Department Secretary is empowered to issue hazardous waste permits and to issue compliance orders or file civil actions.  N.M.S.A. § 74-4-10.  Upon the NM Environment Department Secretary's issuance of a permit, "[a]ny person who is or may be affected by" that permit may appeal to the New Mexico Court of Appeals within thirty days.  See N.M.S.A. § 74-4-14.

The United States is subject to the NMHWA to the extent that Congress has waived sovereign immunity under the RCRA's § 6002(a), which states:

> Each department, agency, and instrumentality . . . shall be subject to, and comply with, all . . . State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions or injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal and management. . . .

42 U.S.C. § 6961(a).

### A.   THE PLAINTIFFS' IMMINENT AND SUBSTANTIAL ENDANGERMENT RCRA HAZARD SUIT IS AN IMPERMISSIBLE COLLATERAL ATTACK ON THE NM ENVIRONMENT DEPARTMENT'S JULY, 2010, PERMIT DECISIONS THAT CURRENTLY REGULATE THE AIR FORCE'S CORRECTIVE ACTIONS TO REMEDY THE KIRTLAND AFB LEAK THAT WAS DISCOVERED IN 1999.

As the Court discussed above, the Plaintiffs brings this action for injunctive relief against the Air Force pursuant to the RCRA's § 7002(a)(1)(B).  See Complaint ¶ 1, at 1-2.  Specifically, the Plaintiffs allege that "an imminent and substantial endangerment to health or the environment, within the meaning of § 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), may exist due to the release into the environment of solid wastes or hazardous wastes from Kirtland Air Force Base in Albuquerque, New Mexico."  Complaint ¶ 1, at 1.  The Plaintiffs explain further that the endangerment posed is:

> the result of the Air Force's past or present handling, storage, or disposal of petroleum-based fuels from the bulk fuels facility at Kirtland Air Force Base.  The

leaking and spilling of petroleum-based fuels from the bulk fuels facility has created a plume of contaminated soil and groundwater extending more than a mile off the Kirtland Air Force Base property beneath a residential neighborhood.  The plume of contamination potentially threatens the Ridgecrest 3 and Ridgecrest 5 municipal supply wells operated by the Albuquerque-Bernalillo County Water Utility Authority."

Complaint ¶ 1, at 2.  Accordingly, the Plaintiffs request that the Court enjoin the Air Force, pursuant to the RCRA, "to abate and mitigate the endangerment."  Complaint ¶ 1, at 2.

The RCRA contains a citizen-suit provision, § 7002(a)(1)(B), which permits private citizens to enforce its provisions in some circumstances and to augment government Environment enforcement.   See Meghrig v. KFC Western, Inc., 516 U.S. at 483 (citing 42 U.S.C. § 6972(a)(1)(B)).

> **(a)     In general**
>
> Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf --
>
> > (1)(A)  against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or
> >
> > (B)     against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a)(1)(A)-(B).  There are two requirements for a citizen to bring suit under the RCRA's § 7002(a)(1)(B).  See Meghrig v. KFC Western., Inc., 516 U.S. at 483 (citing 42 U.S.C.

- 59 -

§ 6972(a)(1)(B)).

> The first concerns the necessary timing of a citizen suit brought under § 6972(a)(1)(B): That section permits a private party to bring suit against certain responsible persons, including former owners, "who ha[ve] contributed or who [are] contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which *may present* an *imminent* and substantial endangerment to health or the environment." (Emphasis added.) The second defines the remedies a district court can award in a suit brought under § 6972(a)(1)(B): Section 6972(a) authorizes district courts "*to restrain* any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste ..., *to order such person to take such other action as may be necessary,* or both." (Emphasis added.)

Meghrig v. KFC Western., Inc., 516 U.S. at 483 (emphasis in the original).  Assessing the scope of the remedies provided under the RCRA's § 7002(a), the Supreme Court explained,

> It is apparent from the two remedies described in § 6972(a) that RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts.  Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, *i.e.,* one that orders a responsible party to "take action" by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.,* one that "restrains" a responsible party from further violating RCRA.

Meghrig v. KFC Western., Inc., 516 U.S. at 484.

One year following the Supreme Court's discussion of citizen-suit remedies under the RCRA's § 7002(a) in Meghrig v. KFC Western., Inc., 516 U.S. at 484, the Tenth Circuit addressed similar questions related to the statutory limits on plaintiffs' citizen-suits, noting specifically the RCRA's bar on collateral attacks on the permit decisions of the EPA or of other federally-authorized state agencies.  See Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.

> Under the RCRA's § 7002(a)(1)(B), any person may bring an action against anyone else "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B). This provision is limited only

- 60 -

by § 6972(b)'s bar on suits "to restrain or enjoin the issuance of a permit." § 6972(b)(2)(D).  For individuals desiring to judicially challenge the issuance of a Resource Conservation and Recovery Act permit, § 6976(b) provides for direct appeal of Environment Protection Agency permit decisions to the circuit court of appeals in which the individual resides within 90 days of the permit decision at issue, unless the application for review is based on information that arose after the 90–day period has expired. § 6976(b). All challenged permit decisions are considered under the "arbitrary and capricious" standard of review.  *See id.;* 5 U.S.C. § 706.  Thus, by its own terms, the Resource Conservation and Recovery Act does not allow collateral attacks on Environment Protection Agency permit decisions or those of state agencies with federally-delegated authority.  *See* § 6976(b) (state-issued permits under the Resource Conservation and Recovery Act have same force and effect as those issued by Environment Protection Agency).

Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.  When discussing citizens' actions under the RCRA's § 7002(a)(1)(B), the Tenth Circuit has placed great emphasis on the distinction between properly advanced RCRA citizen-suits based on the plaintiffs' sufficient showing of "an imminent and substantial endangerment to health or the environment" that the facility causes, 42 U.S.C. § 6972(a)(1)(B), as opposed to improper collateral suits involving plaintiffs who attempt merely to challenge judicially a hazardous waste facility's permit or the permitting procedures that resulted in the EPA's or stage agency's issuance of the permit.

See Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492. The latter challenge is collateral in nature, as the Tenth Circuit clarified, and is not permitted under the RCRA's § 7002(a)(1)(B).  See Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.  Ultimately, based on the distinction between proper citizen-suits and improper collateral attacks, the Tenth Circuit held that the district court could not exercise jurisdiction over the plaintiffs' RCRA imminent and substantial endangerment challenge to the Utah Department of Environment Quality's permit issued to the United States Army relating to the U.S. Army's incinerator, given that the plaintiffs were really challenging the permitting decision of the Utah Department of Environment Quality, which was acting as an authorized state

agency in its operation of its federally-authorized hazardous waste program under the RCRA.  See

Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492 (citing

Greenpeace, Inc. v. Waste Tech. Industries, 9 F.3d 1174 (6th Cir. 1993); Palumbo v. Waste

Technology Industries, 989 F.2d 156 (4th Cir. 1993)).

> Because Plaintiffs' imminent hazard claim essentially attacks Utah's decision to
> issue the Army a Resource Conservation and Recovery Act permit, we conclude
> that the district court properly refused to recognize jurisdiction under § 6972(b).
> The Resource Conservation and Recovery Act's implementing regulations provide
> that the Environment Protection Agency may not issue a permit for trial burns
> without first having determined that they "will not present an imminent hazard to
> human health or the environment." 40 C.F.R. § 270.62(b)(5)(ii). Under Utah's
> parallel regulatory provisions, the Executive Secretary of the Utah Solid and
> Hazardous Waste Control Board, a division of the Utah Department of
> Environment Quality, was required to make the exact same finding before issuing
> Tooele's Resource Conservation and Recovery Act permit under its federally-
> delegated authority. Because Plaintiffs' imminent hazard claim directly challenges
> this finding, we are unable to construe it as anything other than a collateral attack
> on the Executive Secretary's permit decision itself.

Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.

Importantly, when issuing the holding, the Tenth Circuit referenced the limited judicial review of

agency permit decisions under the RCRA, see 42 U.S.C. § 6972(b)(2)(D), stating that "recognizing

jurisdiction in this case," and in other instances of plaintiffs' collateral attacks, "would severely

undermine the limited judicial review of agency permit decisions provided under the Resource

Conservation and Recovery Act, allowing disgruntled individuals to circumvent the Act's 90-day

window for directly challenging such decisions and deferential standard of review." Chemical

Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.

Other United States Courts of Appeals have ruled similarly when addressing the

jurisdictional limits of federal courts reviewing plaintiffs' lawsuits brought under the RCRA's

§ 7002(a)(1)(B)).  See Greenpeace, Inc. v. Waste Tech. Industries, 9 F.3d 1174; Palumbo v. Waste

Technology Industries, 989 F.2d 156.  See also 42 U.S.C. § 6972(a)(1)(B).  For example, in

Greenpeace, Inc. v. Waste Tech. Industries, the United States Court of Appeals for the Sixth Circuit

held that the plaintiffs' imminent hazard citizen suit against the U.S. Army's hazardous waste

incinerator, operating within a valid RCRA permit's scope, represented an impermissible collateral

attack on the EPA's permit decision.  See 9 F.3d at 1181-1183.  Similarly, in Palumbo v. Waste

Technology Industries, the United States Court of Appeals for the Fourth Circuit held, under

similar circumstances, that the plaintiffs' imminent hazard citizen suit against a private entity's

hazardous waste facility, operating under a valid RCRA permit's scope, represented an

impermissible collateral attack on an EPA permit decision, see 989 F.2d at 159-162.

The Sixth Circuit's reasoning in Greenpeace, Inc. v. Waste Tech. Industries is particularly

relevant, because, in characterizing the plaintiffs' request for an injunction under the RCRA's

7002(a)(1)(B) as an impermissible collateral attack on the corrective measures outlined in the then-

operational EPA permit governing the U.S. Army's corrective actions, the Sixth Circuit undertook

a methodical statutory interpretation-based approach to validate the holding.  See Greenpeace, Inc.

v. Waste Tech. Industries, 9 F.3d at 1180.

> Section 6925(a) requires each person owning or operating a hazardous waste treatment, storage, or disposal facility to have a permit issued pursuant to the RCRA. Obtaining such a permit is difficult. As one commentator described it, "[t]he EPA's graphic on the RCRA permitting process looks something like the organizational chart of the Prussian army, with no less than twenty-six notable loci of decision." 4 William H. Rodgers, Jr., Environment Law § 7.13, at 113 (1992). Several of these loci provide opportunities for public input into the permitting decision.  Once the EPA's regional personnel make a preliminary determination that a permit should be issued, public notice establishing a written comment period is issued.  Interested persons are required to raise all matters they wish to contest during the comment period.  EPA regulations make available an informal hearing upon a demonstration of "a significant degree of public interest" in the draft permit. 40 C.F.R. § 124.12(a)(1).
>
> If the EPA then decides to issue the permit, that decision may be appealed to the EPA Administrator, and then to the appropriate United States Circuit Court of Appeals. 42 U.S.C. § 6976(b). § 6976(b) sets the ground rules for judicial review of the RCRA permits. It provides that review of the EPA Administrator's decision

in issuing, denying, modifying, or revoking any permits for treatment, storage, or disposal of hazardous waste

> may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such issuance, denial, modification, revocation, grant, or withdrawal, or after such date only if such application is based solely on grounds which arose after such ninetieth day. *Action of the Administrator with respect to which review could have been obtained under this sub§ shall not be subject to judicial review in civil or criminal proceedings for enforcement.* Such review shall be in accordance with §s 701 through 706 of Title 5.

42 U.S.C. § 6976(b) (emphasis added).

The provisions Congress wrote into § 6976(b) demonstrate that it intended to make it quite difficult to have an EPA permitting decision reversed in court. By specifying that courts of appeals are to review the permit decision in accordance with 5 U.S.C. §§ 701-706, the judicial review provisions of the Administrative Procedure Act, Congress manifested an intention that these courts adhere to a standard of review that is deferential to the EPA's expertise in these matters. See 5 U.S.C. § 706; Palumbo, 989 F.2d at 161. By specifying that review of the Administrator's permit decisions may be had in the courts of appeals within ninety days, but otherwise "shall not be subject to judicial review in civil or criminal proceedings for enforcement," Congress gave the courts of appeals exclusive jurisdiction to review permit decisions and render judgments that cannot be relitigated or otherwise collaterally attacked in the district courts. *See,* e.g., Louisville and Nashville R.R. Co. v. Donovan, 713 F.2d 1243, 1245 (6th Cir.1983) (citing Whitney Nat'l Bank v. Bank of New Orleans & Trust Co., 379 U.S. 411, 420, 422 (1965); cert. denied, 466 U.S. 936, (1984); see also Palumbo, 989 F.2d at 159, 161. Congress established such exclusive jurisdiction "to insure speedy resolution of the validity of EPA determinations." Environment Defense Fund v. U.S. E.P.A., 485 F.2d 780, 783 (D.C. Cir. 1973).

Nothing in the language or legislative history of § 6976(b) suggests that § 6972(a)(1)(B) is somehow exempt from its limitations. Indeed, the legislative history of §§ 6972(a)(1)(B) and 6976(b) only underscores that citizens may not bring § 6972(a)(1)(B) suits to challenge permitted activity.

Greenpeace, Inc. v. Waste Tech. Industries, 9 F.3d at 1180-81.

The Sixth Circuit subsequently contextualized its statutory reading of the RCRA with an

analysis of the legislative history of the Hazardous and Solid Waste Amendments of 1984, the

legislation that created the RCRA's § 7002(a)(1)(B).   See Greenpeace, Inc. v. Waste Tech.

Industries, 9 F.3d at 1180.

> In the Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98-
> 616, § 403(d)(5), 98 Stat. 3221, 3273 (1984) ("HSWA"), the legislation that
> created § 6972(a)(1)(B), Congress amended § 6976(b). Congress added to §
> 6976(b) the sentence stating that "[a]ction of the Administrator with respect to
> which review could have been obtained under this sub§ shall not be subject to
> judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. §
> 6976(b). Prior to the 1984 HSWA, this sentence had been in § 6976(a)(1), which
> addresses appeals of the EPA's promulgation of regulations, but was not in §
> 6976(b), which addresses appeals of the EPA's permitting decisions. Compare 42
> U.S.C. § 6976(a)(1) with 42 U.S.C. § 6976(b) (1980)(amended 1984). The House
> Conference Report indicated the intended relationship between the enactment of §
> 6972(a)(1)(B) and the amendment of § 6976(b) by noting that citizen suits "are
> prohibited . . . with respect to siting and  permitting of hazardous waste facilities."
> H.R.Conf.Rep. No. 1133, 98th Cong., 2d Sess. 117–18 (1984), reprinted in 1984
> U.S.C.C.A.N. 5649, 5688–89.
>
> Another provision enacted as part of the HSWA, sub§ (b)(2)(D) of §
> 6972 itself, places express limitations on the right to initiate citizen suits under
> subsection (a)(1)(B). Subsection (b)(2)(D) provides that "[n]o action may be
> commenced under sub§ (a)(1)(B) of this section by any person (other than a State
> or local government) with respect to the siting of hazardous waste treatment,
> storage, or a disposal facility, nor to restrain or enjoin the issuance of a permit for
> such facility." 42 U.S.C. § 6972(b)(2)(D).   Significantly, the House Report
> explained this limitation by noting that "[t]he Committee believes that other legal
> authority is available to challenge deficiencies in the permitting process." H.R.Rep.
> No. 198, Part I, 98th Cong., 2d Sess. 53 (1984), reprinted in 1984 U.S.C.C.A.N.
> 5576, 5612.

Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d at 1180-81.

Ultimately, then, based both on the Sixth Circuit's statutory reading of the RCRA,

combined with its assessment of the legislative history of the RCRA provisions that relate

specifically to the judicial review of RCRA permits, see 42 U.S.C. § 6972(b)(2)(D)  the Sixth

Circuit concluded that the RCRA's § 7002(a)(1)(B) grant of authority for citizens to sue:

> does not extend to persons operating hazardous waste facilities in compliance with
> valid RCRA permits. The language of § 6972(b)(2)(D) clearly states that citizens
> may not commence § 6972(a)(1)(B) suits "with respect to the citing of [a]
> hazardous waste . . . disposal facility, nor to restrain or enjoin the issuance of a

permit for such facility." 42 U.S.C. § 6972(b)(2)(D). Any review of permitting decisions must be sought only before the appropriate United States Circuit Court of Appeals. 42 U.S.C. § 6976(b).

Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d at 1181.

Based on the holdings in Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492; Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d at 1180-81, and Palumbo v. Waste Technology Industries, 989 F.2d 159-162, the Plaintiffs' attempts to argue that their lawsuit is something other than a collateral attack on the NM Environment Department's Permit issued to the Air Force in July, 2010, are unpersuasive.  See Response at 11-16.  Rather, the Plaintiffs' claims here are comparable to the Plaintiffs' claims in Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492, and Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d at 1180, in that the Plaintiffs, beneath the guise of an "imminent and substantial endangerment to the health or the environment" claim, 42 U.S.C. § 6972(a)(1)(B), are merely attacking the already-existing NM Environment Department Permit that is regulating the Air Force's corrective actions, which means, necessarily, that they are asking the Court to enjoin the Air Force's current safety and clean-up efforts that are being overseen by a federally-authorized body -- the NM Environment Department -- that is responsible to ensure the Air Force complies with the Permit measures in conjunction with NMHWA regulations.  See Permit at 1.  Rebutting the notion that they are advancing a collateral attack under the RCRA's § 7002(a)(1)(B), the Plaintiffs insist that they "have no quarrel with the permit the NM Environment Department issued to the Air Force, Response at 12, and, they state that their imminent hazard claim is not focused on the NM Environment Department's permit process, see Response at 12.  Instead, the Plaintiffs contend that their claim is focused on the Kirtland AFB fuel leak, which they characterize as presenting "an imminent and substantial endangerment to health or the environment within the

meaning of § 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B)," and "may exist due to the release into the environment of solid wastes or hazardous wastes from Kirtland Air Force Base in Albuquerque, New Mexico,"  Complaint ¶ 1, at 2.  The Court concludes, however, that the Plaintiffs' distinction here is superficial, because, in their Complaint, when referencing the Kirtland AFB leak, the Plaintiffs explicitly request that the Court supersede the NM Environment Department Permit's corrective measures for a Court-created alternative process and timeline under which the Air Force would be forced to comply.  See Complaint Prayer for Relief ¶ 1, at 15 (asking the Court to "[e]njoin[] the Defendant to take action to abate the imminent and substantial endangerment to health and the environment according to a reasonable but aggressive schedule ordered by this Court.").  Under the RCRA's § 7002(a)(1)(B), however, the Court, is judicially barred from modifying or substituting already operational schedules, regulations, and safety measures implemented by a federally authorized state entity, the NM Environment Department.  See 42 U.S.C. § 6972(a)(1)(B).  To do what the Plaintiffs ask, would require the Court to modify actively the Permit's provisions, see Permit at 1-18, related to the Air Force's current means of accomplishing the Corrective Action for the spill, and essentially strip the NM Environment Department of the authority it exercises over these corrective actions pursuant to the Permit, see Permit at 5-10.  Furthermore, the Plaintiffs' alleges:

> As of this date, the Air Force has not yet fully defined the northwest portion of the plume of groundwater contaminants [from the Bulk Fuel Facility].  A Corrective Measures Study (CMS) -- the next step after a RCRA Facility Investigation -- has not yet been completed. A final remedy for cleanup of the groundwater contaminants has not been selected or implemented. There is no written work plan and no written schedule for completing the investigation, for completing a CMS, or for implementing a final remedy for cleanup of the contaminants in the soil and groundwater.

Complaint ¶ 40, at 13.  The Permit explicitly outlines the specific corrective measures that the Air Force must take to achieve sufficient cleanup of the contaminants in the soil and groundwater the

Kirkland AFB Leak caused.  See Permit ¶¶ 6.2.2.2., 6.2.2.2.6, 6.2.2.2.7, at 5-10.  In addition, the NM Environment Department Permit requires that the Air Force's [Corrective Measures Implementation] CMI Work Plan "describe the design, construction, operation, maintenance, and performance monitoring for the selected remedy and a schedule for its implementation,"  Permit ¶ 6.2.2.2.7, at 10, and requires that the CMI Work Plan be approved before its implementation, see Permit ¶ 6.2.2.2.7, at 10.

Ultimately, then, because the Court characterizes the Plaintiffs' Complaint as a collateral attack on the Air Force's continuing corrective actions and ongoing regulatory efforts conducted pursuant to the currently operational NM Environment Department Permit, the Court concludes that the Plaintiffs do not properly advance an "imminent and substantial endangerment to health or the environment" claim under the RCRA's § 7002(a)(1)(B), see 42 U.S.C. § 6972(a)(1)(B), and, therefore, the Court lacks subject-matter jurisdiction to hear their claim, see Greenpeace, Inc. v. Waste Tech. Industries, 9 F.3d at 1180-81 ("We therefore conclude that the only method Congress provided in the RCRA to challenge permitted activity is a challenge to the permit itself through § 6976(b) . . . .   A hazardous waste operator's compliance with the terms of its RCRA permit precludes district court jurisdiction under § 6972(a)(1)(B) to challenge properly permitted activity.").

**B.      EXERCISING JURISDICTION OVER THE PLAINTIFFS' LAWSUIT WOULD UNDERMINE THE RCRA'S LIMITED REVIEW PROVISIONS, AND UNDERCUT THE NMHWA'S PERMIT APPEAL PROCEDURES, WHICH PREVIOUSLY PROVIDED THE PLAINTIFFS AN OPPORTUNITY TO CHALLENGE THE NM ENVIRONMENT DEPARTMENT PERMIT.**

In  addition  to  the  Court  concluding  that  the  Plaintiffs'  imminent-and-substantial-endangerment RCRA lawsuit is an impermissible collateral attack on the NM Environment Department Permit, the Court concludes that it cannot exercise subject-matter jurisdiction over

this lawsuit, because exercising jurisdiction in this case "would severely undermine" the RCRA's

limited judicial review provisions under 42 U.S.C. § 6976(b).  Chemical Weapons Working Group

v. United States Dep't of the Army, 111 F.3d at 1492.  As the Court referenced above, the Tenth

Circuit has indicated that collateral attacks on state-issued RCRA permits "would

severely undermine the limited judicial review of agency permit decisions provided under the

Resource Conservation and Recovery Act, allowing disgruntled individuals to circumvent the

Act's 90-day window for directly challenging such decisions and deferential standard of review."

Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492 (citing

Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d 1174; and Palumbo v. Waste Tech. Indus., 989

F.2d 159-162)).

The Tenth Circuit's interpretation of the limited judicial review provisions under the

RCRA, see 42 U.S.C. § 6976(b), is in line with the Sixth Circuit's textual analysis of the RCRA

in Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d at 1180.

> The provisions Congress wrote into § 6976(b) demonstrate that it intended
> to make it quite difficult to have an EPA permitting decision reversed in court. By
> specifying that courts of appeals are to review the permit decision in accordance
> with 5 U.S.C. §§ 701-706, the judicial review provisions of the Administrative
> Procedure Act, Congress manifested an intention that these courts adhere to a
> standard of review that is deferential to the EPA's expertise in these matters. See 5
> U.S.C. § 706; Palumbo, 989 F.2d at 161. By specifying that review of the
> Administrator's permit decisions may be had in the courts of appeals within ninety
> days, but otherwise "shall not be subject to judicial review in civil or criminal
> proceedings for enforcement," Congress gave the courts of appeals exclusive
> jurisdiction to review permit decisions and render judgments that cannot be
> relitigated or otherwise collaterally attacked in the district courts.  See,
> e.g., Louisville and Nashville R.R. Co. v. Donovan, 713 F.2d 1243, 1245 (6th Cir.
> 1983)(citing Whitney Nat'l Bank v. Bank of New Orleans & Trust Co., 379 U.S.
> 411, 420, 422, (1965)), cert. denied.   See also Palumbo, 989 F.2d at 159, 161.
> Congress established such exclusive jurisdiction "to insure speedy resolution of the
> validity of EPA determinations."  Environment Defense Fund v. U.S. E.P.A., 485
> F.2d 780, 783 (D.C. Cir. 1973).

Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d at 1180.  The Tenth Circuit's conclusion is also

in agreement with the United States Court of Appeal for the Fourth Circuit's discussion of the limited jurisdictional review under the RCRA in <u>Palumbo v. Waste Technology Industries</u>, 989 F.2d at 160-161.

> Generally, when jurisdiction to review administrative determinations is vested in the courts of appeals these specific, exclusive jurisdiction provisions preempt district court jurisdiction over related issues under other statutes." <u>Connors v. Amax Coal Co.</u>, 858 F.2d 1226, 1231 (7th Cir. 1988); <u>accord</u> <u>Media Access Project v. FCC</u>, 883 F.2d 1063, 1067–69 (D.C. Cir. 1989).

<u>Palumbo v. Waste Technology Industries</u>, 989 F.2d 160-161.

Similar to the conclusions that the Tenth Circuit, the Fourth Circuit, and the Sixth Circuit made, here, the Court concludes that  allowing the Plaintiffs to advance a collateral attack on the NM Environment Department Permit issued to the Air Force in July, 2010, would "severely undermine" the NMHWA's permit appeal procedures that granted the Plaintiffs thirty days to seek review of the Permit to the Court of Appeals of New Mexico.  <u>Chemical Weapons Working Group v. United States Dep't of the Army</u>, 111 F.3d at 1492.  <u>See</u> <u>Greenpeace, Inc. v. Waste Techs. Indus.</u>, 9 F.3d at 1180-81; <u>Palumbo v. Waste Technology Industries</u>, 989 F.2d 159-162.  <u>See</u> <u>also</u> N.M.S.A. §§ 74-4-4.2, 74-4-14(A); NMAC § 20.4.1.901(B).   Notably, the Plaintiffs never appealed the Permit to the Court of Appeals of New Mexico during the thirty-day window, but attempt, now -- approximately a decade after the appeal period expired -- to review and modify the NM Environment Department Permit.   <u>See</u> N.M.S.A. §§ 74-4-4.2, 74-4-14(A); NMAC § 20.4.1.901(B).  <u>See</u> <u>also</u> MTD at 11; Response at 12-14.  The Court cannot take this action, because modifying the approved and currently operational NM Environment Department Permit would result in the Court overstepping its jurisdictional authority under the RCRA, <u>see</u> 42 U.S.C. § 6976(b), and, in turn, as the Tenth Circuit noted, essentially "allow[] disgruntled individuals to circumvent" the NMHWA's explicit thirty-day window in which the Plaintiffs were afforded

opportunity to challenge the NM Environment Department Permit in 2010.  Chemical Weapons Working Group v. United States Dep't of the Army, 111 F.3d at 1492.

Although the Plaintiffs note the existence of the thirty-day window, during which they could have appealed the NM Environment Department Permit, see N.M.S.A. §§ 74-4-4.2, 74-4-14(A); NMAC § 20.4.1.901(B), they allege that, at the time the draft Permit was being considered, they did not have a "meaningful opportunity" to challenge the Permit's Corrective Action section. Response at 12.  Relatedly, the Plaintiffs fault the NM Environment Department for not providing adequate notice of the scope of the Permit's Corrective Actions section.  See Response at 14.  The Plaintiffs' notice argument is unpersuasive, however, because of the Fact Sheet that accompanied the draft Permit, which offered sufficiently specific information related to the Permit's corrective action requirements for the Air Force in its mitigation of the effects of the Kirtland AFB leak.  See NM Environment Department Fact Sheet: April 16, 2007 at 5, filed May 26, 2020 (Doc. 21-1)("Fact Sheet").

> Permit Part 4 (Corrective Action: General Provisions And Procedures) contains permit conditions necessary to meet the corrective action requirements for the SWMUs and AOCs identified and listed in Table 4-2 of this Permit Part (lists of SWMUs and AOCs), site investigations, any newly identified SWMUs and AOCs, and any releases of hazardous waste of hazardous constituents from SWMUs and AOCs set forth at 20.4.1.500 [N.M. Admin. Code], incorporating 40 CFR 264.101.

Fact Sheet at 5.

Yet, even under the assumption that the Plaintiffs' did not receive adequate public notice of the NM Environment Department's draft Permit, it is notable that the NM Environment Department subsequently re-opened the Permit open comment period in 2010 in response to a request it had received.  See Final Decision and Response to Comments Concerning Kirtland Air Force Base Hazardous Waste Facility Permit, Kirtland Air Force Base, EPA ID# NM9570024423,

July 15, 2020; RCRA; Facility Investigation Report at 3-12.  Accordingly, the Plaintiffs do not

offer any explanation why they did not issue a similar request during the second public comment

period for the NM Environment Department to alter its permit plans, nor do they offer any

explanation why they did not take advantage of the NM Environment Department's administrative

process that affords parties a hearing upon request.  See NMAC § 20.4.1.901.  See also Response

at 12-14.

Finally, the Court emphasizes that, even if it does not exercise jurisdiction in this case, the

Plaintiffs are still afforded avenues in which to redress their grievances.  First, the Plaintiffs can

seek modification of the NM Environment Department Permit, pursuant to the NMHWA's

implementing regulations, which allow "any interested person" to request a permit modification.

NMAC § 20.4.1.901(B)(1)(incorporating among other things, 40 C.F.R. § 270.41(a)(2)); NMAC

§ 20.4.1.901(B)(2).  See Permit at 18.  Under the NMHWA's implementing regulations, if the

Plaintiffs believe that new information necessitates a Permit modification,  they can petition the

NM  Environment  Department  to  modify  any  portion  of  the  permit.    See  NMAC  §

20.4.1.901(B)(1).  If the NM Environment Department denies the Plaintiffs' modification request,

the Plaintiffs also are afforded an opportunity to appeal the denial, pursuant to the NMHWA's §

74-4-14(A).  Furthermore, as the Permit issuing body, the NM Environment Department retains

authority to modify, suspend, or revoke the Permit in light of changed circumstances or of new

hazards. See N.M.S.A. §§ 74-4-4.2(D)(6), 74-4-13(A).  See also Greenpeace, Inc. v. Waste Techs.

Indus., 9 F.3d at 1182 (The "EPA can modify or terminate a previously issued permit at any time

if it determines that a facility presents an imminent and substantial endangerment to health or the

environment.").  Last, if the Plaintiffs believe that the Air Force is not complying with the Permit,

they may bring a citizen suit under the RCRA's  §7002(a)(1)(A).  See 42 U.S.C. § 6972(a)(1)(A).

Ultimately, then, because, the Court concludes that the Plaintiffs' imminent-and-substantial endangerment suit under the RCRA's § 7002(a)(1)(B) is an impermissible collateral attack on the NM Environment Department Permit, and, exercising jurisdiction in this case would undermine the limited judicial review provisions under the RCRA, see 42 U.S.C. § 6976(b), the Court dismisses the Plaintiffs' Complaint due to a lack of subject-matter jurisdiction.

## II.  THE COURT DEFERS TO THE NM ENVIRONMENT DEPARTMENT, THE AUTHORIZED STATE REGULATORY AGENCY UNDER THE RCRA, <u>PURSUANT TO THE PRIMARY JURISDICTION DOCTRINE.</u>

In the alternative, the Air Force requests that the Court defer to the NM Environment Department's existing regulatory plan that the Permit outlines, and, therefore, dismiss the Plaintiffs' Complaint pursuant to the doctrine of primary jurisdiction.  See MTD at 14.  The Air Force contends that this case "is well suited for the application of the doctrine of primary jurisdiction," based on a weighing of the Tenth Circuit factors for the application of primary jurisdiction.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349. Specifically, the Air Force contends that primary jurisdiction should apply here, because (i) the case's factual issues are within the NM Environment Department's expertise; (ii) if the Court were to exercise jurisdiction over this matter, the Air Force could be subjected to conflicting orders from both the Court and the NM Environment Department; (iii) the Air Force and the NM Environment Department have already initiated and diligently pursued pertinent agency actions; and (iv) the injunctive relief that the Plaintiffs seek requires scientific or technical expertise.  See MTD at 14-17.  The Plaintiffs counter that the doctrine of primary jurisdiction is inappropriate in this case under the Tenth Circuit's primary jurisdiction factors, see Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349, because (i) the case's issues are within federal courts and judges' experience; (ii) conflicting corrective measure orders from the Court and the NM

Environment Department are unlikely; and (iii) the facts do not support that the Air Force and the NM Environment Department are proceeding diligently to clean up the fuel leak.  See Response at 19-22.  Ultimately, upon consideration of the Tenth Circuit primary jurisdiction factors, the Court concludes that it is prudent in this case to defer to the NM Environment Department's expertise in regulating the Air Force's Kirtland AFB leak cleanup.

"The common law doctrine of primary jurisdiction provides courts with flexible discretion to refer certain matters to the specialized competence of an administrative agency, which . . . is exercising continuing jurisdiction over those matters."  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349.  The Supreme Court has held that where cases implicate the regulatory functions of an administrative agency, such as the NMED in this case, a court should defer to that agency prior to acting on the case.  United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 353 (1963)(The primary jurisdiction "doctrine requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.")(citing Far East Conference v. United States, 342 U.S. 570 (1952); Great Northern R. Co. v. Merchants Elevator Co., 259 U.S. 285 (1922)).  Primary jurisdiction abstention is a discretionary doctrine, and is "appropriate when the agency and the court entertaining Plaintiffs' claims have concurrent jurisdiction, and the claims are properly cognizable in federal court, but the court believes it prudent to decline to exercise its jurisdiction in favor of the agency's expertise."  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349.

New Mexico law also recognizes the primary jurisdiction doctrine, and the Supreme Court of New Mexico has characterized the doctrine in the following way:

[T]he original case creating the doctrine (Texas & P.R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426 (1907)) overrode explicit and unequivocal statutory provisions allowing the courts to act initially. The principal criterion in deciding whether the doctrine is applicable is not legislative intent but usually is judicial

appraisal of need or lack of need for resort to administrative judgment.

Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349 (quoting State ex. rel. Norvell v. Arizona Pub. Serv. Co., 1973-NMSC0-051, 85 N.M. 165, 171, 510 P.2d 98, 104 (internal quotations omitted)).  The United States District Court for the District of New Mexico, in turn, has outlined the policy rationale for adhering to the primary jurisdiction doctrine:

> "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over."  Far East Conference v. United States, 342 U.S. 570, 574 (1952).  New Mexico law also recognizes the doctrine. "[T]he legislature has created the agency in order to afford a systematic method of factfinding . . . and the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention."  State ex. rel. Norvell v. Arizona Pub. Serv. Co., 1973-NMSC-051, 510 P.2d at 104.  The doctrine suspends "the judicial process . . . pending referral of the issues to the administrative body for its views."  Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1376-77 (10th Cir. 1989).  See generally Schwartzman, Inc. v. Atchison, Topeka, & Santa Fe Ry. Co., 857 F. Supp. 838 (D.N.M. 1994)(Burciaga, J.).

> The doctrine of primary jurisdiction may be invoked "sua sponte by the court. . . . [T]he doctrine exists for the proper distribution of power between judicial and administrative bodies, and not for the convenience of the parties."  2 Fed. Proc. L. Ed. § 2:320 (1994)(citations omitted).  No fixed formula constrains the Court's exercise of its discretion to invoke the doctrine, as the determination is largely fact-specific.  Bradford Sch. Bus Transit v. Chicago Transit Auth., 537 F.2d 943, 949 (7th Cir. 1976), cert. denied, 429 U.S. 1066 (1977). Various factors, however, guide a judge's decision to defer to an agency in this context.

Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349.

Under Tenth Circuit law, when considering whether to invoke the primary jurisdiction doctrine, a court should consider five factors.  See  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349-50.  The factors include: (i) "whether [the Court] is being called upon to decide factual issues not within the conventional experience of judges;" (ii) "whether Defendants could be subjected to conflicting orders of both the Court and the administrative agency;" (iii) "whether relevant agency proceedings have actually been initiated;" (iv) "whether the agency has

demonstrated diligence in resolving the issue or has instead allowed the issue to languish;" and (v) "the type of relief Plaintiffs request." Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349 (citing Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1376-77 (10th Cir. 1989)(alterations in original)). The Court concludes that the factors in this case favor its discretionary application of the primary jurisdiction doctrine.

### A. THE FACTUAL ISSUES THE PLAINTIFFS ASK THE COURT TO CONSIDER ARE NOT WITHIN JUDGES' CONVENTIONAL EXPERIENCE.

"First, the Court should consider whether it is being called upon to decide factual issues not within the conventional experience of judges, or are instead issues of the sort that a court routinely considers." Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349 (quoting Marshall v. El Paso Natural Gas Co., 874 F.2d at 1377). In this case, if the Court were to exercise jurisdiction over the Plaintiffs' RCRA claim against the Air Force, and, as the Plaintiffs request, issue injunctive relief, the Court would have to adjudicate whether the contaminated groundwater that the NM Environment Department's Permit and approved interim and regulatory measures currently addresses, "poses an imminent and substantial endangerment to human health or the environment -- an inquiry which, as discussed, can only be described as second-guessing the NMED." Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1349. Furthermore, if the Court were to decide in the Plaintiffs' favor, the Court would, in turn, be required to modify the currently operational NM Environment Department Permit, substituting, as the Plaintiffs request, a "reasonable but aggressive schedule," of which the Air Force would be forced to abide. Complaint, Prayer for Relief, ¶ 1, at 15. As the Honorable C. LeRoy Hansen, federal district judge for the United States District Court of New Mexico, recognized in a similar suit involving a set of the plaintiffs' RCRA claim against a private entity's hazardous waste facility cleanup, the task of

fashioning a sufficient remedy under the RCRA could be onerous for a court without environmental expertise entities like the NM Environment Department holds.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.

> This in turn would require evaluating whether Defendants have adequately investigated the groundwater contamination, or whether further investigation is necessary; whether the existing methods of remediation are adequate; what level of contamination is tolerable; and a myriad other technical matters.  Of course, RCRA contemplates this sort of judicial review, and theoretically, the Court could receive extensive expert testimony, or appoint a special master. But such methods would represent a serious drain of judicial resources and would largely duplicate the past and present efforts of the NMED.  Evaluating the proper components of such a plan is best left to the NMED, a body that is far better suited to resolve such issues by reason of "specialization, by insight gained through experience, and by more flexible procedure."  Far East Conference, 342 U.S. at 575. If Plaintiffs' goal is ultimate and complete remediation of the site, this goal would be achieved faster and more efficiently through the efforts of the NMED without interference from the Court.

Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.

Similar circumstances exist here, which caution the Court against substituting its own judgment for that of the NM Environment Department.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  Specifically, if the Court were to exercise jurisdiction, it would necessarily be required to devote an extraordinary amount of time to educating itself on the adequacies and inadequacies of the current remediation efforts in place under the Permit, as to gauge what, in the Court's mind, would satisfy the Plaintiffs as more appropriate corrective measures.  Not only would the Court's efforts here slow the Air Force's completion of the necessary corrective actions to mitigate the effects of the leak, but it would require the Air Force to have to divert resources away from its current remedial efforts to adjust to potentially an entire new set of regulatory measures.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  Because any change in the current course ultimately could undermine the Air Force's overall efforts to complete the Kirtland AFB cleanup in a timely manner, the Court concludes that

factor one weighs in favor of the Court refusing jurisdiction over the matter.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.

### B.    THE AIR FORCE COULD BE SUBJECTED TO CONFLICTING ORDERS FROM THIS COURT AND THE NM ENVIRONMENT DEPARTMENT.

"Second, the Court should consider whether Defendants could be subjected to conflicting orders of both the Court and the administrative agency."  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  In their Complaint, the Plaintiffs request that the Court order the Air Force "to take action to abate the imminent and substantial endangerment to health and the environment according to a reasonable but aggressive schedule."  Complaint, Prayer for Relief, ¶ 1, at 15.  To grant this relief, the Court would be forced to "independently determine an appropriate investigatory and remediation plan," which, as the Court discussed above, would demand the Court to spend extensive time acquiring the scientific and technical expertise to essentially step into the NM Environment Department's regulatory shoes.  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  Yet, even if the Court were able to obtain this extensive knowledge as to impose credible and scientifically backed modifications to the current Permit, aspects of the Court's subsequent order still could contradict the NM Environment Department Permit and subject the Air Force to conflicting obligations that could impede the currently delineated corrective action processes and interim measures that the NM Environment Department has calculated as necessary to cleaning up the spill.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.   At present, the NM Environment Department Permit requires that the NM Environment Department approve each step the Permit outlines before the Air Force accomplishes the given remedial measure.  See Permit, Part 6, at 5-8. If the Court were to attempt to invade into the NM Environment Department's area of expertise here, the potential for "conflicting obligations" is high.  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at

1350. "One purpose of the doctrine of primary jurisdiction is to promote uniformity and harmony in the regulatory sphere the agency is entrusted to govern."  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350 (citing Nader v. Allegheny Airlines, 426 U.S. 290, 303-04 (1976); Marshall v. El Paso Natural Gas Co, 874 F.2d at 1377)).  Accordingly, the Court concludes that the purpose of "uniformity and harmony" in the regulatory sphere of hazardous waste cleanup would be best served by deferring to the NM Environment Department Permit's carefully considered regulatory mechanisms and corrective measures.  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.

C.   **THE AIR FORCE AND THE NM ENVIRONMENT DEPARTMENT HAVE INITIATED AND DILIGENTLY PURSUED PERTINENT AGENCY ACTIONS TO MITIGATE THE EFFECTS OF THE KIRTLAND AFB SPILL.**

"A third factor courts have considered in this context is whether relevant agency proceedings have actually been initiated. 'It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency.'"  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350 (citing Roberts v. Chemlawn Corp., 716 F. Supp. 364, 365-66 (N.D. Ill. 1989)(quoting Mississippi Power & Light Co. v. United Gas Pipe Line Co., 532 F.2d 412, 420 (5th Cir .1976), cert. denied, 429 U.S. 1094 (1977)).  Relatedly, courts also consider a fourth factor -- "whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to languish.   Administrative delay constitutes reason to retain jurisdiction."  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350 (citing Roberts v. Chemlawn Corp, 716 F. Supp. at 366; In re "Agent Orange" Prod. Liab. Litig., 475 F. Supp. 928, 933 (E.D.N.Y. 1979)).  In this case, the record indicates, and the parties do not dispute, that the NM Environment Department already has acted to ensure that the Air Force investigates and contains the Kirtland AFB leak, and, under the currently operative NM Environment Department

Permit, the NM Environment Department "continues to exercise regulatory oversight" over the

Air Force's efforts.  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  The

Plaintiffs even concede that "relevant agency proceedings have actually been initiated" and outline

the corrective actions that the Air Force has taken since first discovering the leaking fuels in

November, 1999.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  See

also Complaint ¶ 38, at 12.

> Between 2011 and 2012, the Air Force replaced the tanks and other structures at the [Kirtland AFB] facility, as required under a Stipulated Final Order issued by the New Mexico Environment Department, No. HWB-09-00 (CO), on September 28, 2009.   The Air Force Base has also installed vadose zone and groundwater monitoring wells and conducted investigations of soil and groundwater contaminants . . . implemented soil vapor extraction to remove volatile organic compounds from the vadose zone . . . installed four groundwater extraction wells and constructed a carbon treatment system to remove contaminants from extracted groundwater.

Complaint, ¶ 38, at 12.  Moreover, the Plaintiffs' descriptions of the Air Force's ongoing corrective

efforts, conducted pursuant to the Permit, indicate to the Court that both the Air Force and the NM

Environment Department have acted "with deliberate care and diligence" in resolving issues

related to the Kirtland AFB leak, and, therefore, have not allowed "the issue to languish."  Friends

of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  The Plaintiffs subsequently provide

details of the March 31, 2014, Phase 1 RCRA Facility Investigation Report that the Air Force

submitted to the NM Environment Department.  See Complaint ¶ 39, at 12.

> On March 31, 2014, the Air Force submitted to the New Mexico Environment Department a RCRA Facility Investigations report addressing the vadose zone, and a second RCRA Facility Investigations Report addressing groundwater.  On August 27, 2014, the Air Force retracted the two reports.  The Air Force submitted a new RCRA Facility Investigations Report on January 20, 2017.  The Environment Department concluded, in a letter dated August 3, 20176, that the report was deficient.  The Environment Department sent a subsequent "notice of deficiency" letter to the Air Force on November 16, 2017.  On August 29, 2018, the Air Force submitted to the Environment Department a Phase 1 RCRA Facility Investigations Report for the Bulk Fuels Facility.  The Environment

Department has not yet approved the investigation report.

Complaint ¶ 39, at 12.

The Phase 1 RCRA Facility Report, in itself, is indicative "whether relevant agency proceedings have actually been initiated," Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350, in that the RCRA Facility Report: (i) offers details about the investigations and interim measures that the Air Force took between November, 1999 and December, 2015, see RCRA Facility Report, ¶¶ 8.1-8.2, at 7-9, (ii) identifies additional areas of evaluation the Air Force is required to address, and the NM Environment Department's recommendations to address these areas, see RCRA Facility Report ¶¶ 8.1-8.2, at 7-9; and (iii) describes the NM Environment Department's ongoing and consistent regulatory efforts within the References Section, see RCRA Facility Report, at 10-11.

Furthermore, as the NM Environment Department Permit indicates, under the NM Environment Department's regulatory oversight, and pursuant to its approval, the Air Force extracted tons of contaminated soil and completed twelve years of soil vapor extraction. See Permit at 4-6. In addition, between 2000 and 2015, the Air Force installed 134 groundwater monitoring wells and one observation well. See Permit at 3. In 2015, the Air Force installed, and is currently using, a "pump and treat" system to "reduce the risks of groundwater contamination." Permit at 3. Relatedly, since 2017, the Air Force has employed Bioventing and Air-Life Enhanced Bioremediation Pilot Tests "to support the future Corrective Measures Evaluation ("CME") for the Bulk Fuels Facility ("BFF") source area and groundwater solute plume." NM Environment Department Letter to the Air Force Re: Work Plan for Bioventing and Air-Life Enhanced Bioremediation Pilot Tests at 1, dated April 6, 2018, filed April 20, 2020 (Doc. 13-4)("April 6, 2018 Letter"). Finally, at present, the Air Force is undertaking Ethylene Dibromide in Site

Biodegradation Pilot Testing, which is intended to treat the contamination from the Kirtland AFB

Leak.  NM Environment Department Letter to the Air Force: Re: Phase 3 Ethylene Dibromide in

Situ Biodegradation Pilot Test Notification Letter, dated August 7, 2018, filed April 20, 2020 (Doc.

13-5)("August 7, 2018 Letter).   Ultimately, then, based on the record, the Court concludes that

"relevant agency proceedings have actually been initiated," and the Air Force and the NMED have

"acted with deliberate care and diligence" in their working to "resolve[] the issue."  Friends of

Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.

### D. THE PLAINTIFFS SEEK INJUNCTIVE RELIEF THAT REQUIRES SCIENTIFIC OR TECHNICAL EXPERTISE.

> And finally, the Court should consider the type of relief Plaintiffs request.
> Courts refuse to defer jurisdiction if the plaintiff is seeking damages for injury to
> property or person, as this is the type of relief courts routinely evaluate; however,
> if the plaintiff seeks injunctive relief, requiring scientific or technical expertise, the
> doctrine is more readily applicable.

Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350 (citing Ryan v. Chemlawn

Corp., 935 F.2d 129, 131 (7th Cir. 1991)(concluding that, because the plaintiff dropped the claim

for injunctive relief, the lower court improperly invoked primary jurisdiction doctrine);  O'Hare v.

Valley Utils., Inc.,1976-NMCA-004, 89 N.M. 105, 111, 547 P.2d 1147, 1153 (concluding that

injunctive relief is "identical to the relief which the agency could have granted" and therefore

primary jurisdiction lies with the agency), rev'd in part on other grounds, 1976-NMSC-024, 89

N.M. 262, 550 P.2d 274).   Here, the Plaintiffs bring an RCRA imminent-and-substantial

endangerment citizen suit, in which they seek specific injunctive relief asking the Court to enjoin

the Air Force "to take action to abate the imminent and substantial endangerment to health and the

environment according to a reasonable but aggressive schedule ordered by this Court."  Complaint

Prayer for Relief ¶ 1, at 15.  As the Court explains above, however, this relief is beyond its current

expertise.  Specifically, to make appropriate modifications to the NM Environment Department

Permit, as to satisfy not only the Plaintiffs, but to protect the health of citizens in Albuquerque, the Court would be required to assess complex evidence that requires "scientific or technical expertise," which is beyond the Court's normal judicial capacity.  Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  Furthermore, the Court, as an Article III institution, does not typically evaluate this relief.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1350.  Rather, under the RCRA, the NM Environment Department is the federally authorized body that is empowered to regulate the scientific and technical matters related to hazardous waste cleanup on behalf of New Mexico citizens.  See 40 C.F.R. § 272.1601.  The NM Environment Department has exercised this responsibility already in relation to the Kirtland AFB leak, and, through diligent application of its expertise, has proposed and regulated the Air Force's corrective actions pertaining to the Kirtland AFB facility, which the NM Environment Department Permit articulates.  See Permit at 3, 5-15.  See also Friends of Santa Fe Cty. V. LAC Minerals, Inc., 892 F. Supp. at 1350 ("This is exactly the type of relief the NMED, in its expertise, considered, and, in the manner it deemed most appropriate, provided.").  Accordingly, the Court concludes that factor five weighs in favor of the Court's application of the primary jurisdiction doctrine.

In summary, because the Court concludes that (i) the case's factual issues are within the NM Environment Department's expertise; (ii) the Air Force could be subjected to conflicting orders of both the NM Environment Department and the Court; (iii) the Air Force and the NM Environment Department have initiated relevant agency proceedings; (iv) the NM Environment Department has demonstrated diligence in resolving the Kirtland AFB leak issue; and (iv) the Plaintiffs' requested injunctive relief requires scientific or technical expertise, the Court will defer to the NM Environment Department's expertise here and will dismiss the Plaintiff's Complaint.  See Friends of Santa Fe Cty. V. LAC Minerals, Inc., 892 F. Supp. at 1350 ("'[I]t would be improper

for this Court to exercise its equitable jurisdiction to interfere with the comprehensive programs designed to solve a complex social, economic and technological problem.  Quite simply, [the Court] choose[s] not to pollute the scene with still more studies and standards.'")(citing State ex. Rel. Norvell v. Arizona Pub. Serv. Co., 1973-NMSC-051, 85 N.M. at 172, 510 P.2d at 105, and quoting City of Chicago v. General Motor Corp., 332 F. Supp. 285, 291 (N.D. Ill. 197), aff'd, 467 F. 2d 1262 (7th Cir. 1972)("While the state and federal governments may not be moving as swiftly as plaintiff would like in this area the fact remains that legislative and administrative guidelines and programs have been initiated.")).

**IT IS ORDERED** that: (i) the requests in the Defendant's Motion to Dismiss and Memorandum in Support, filed April 20, 2020 (Doc. 13), are granted; and (ii) the case is dismissed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Charles de Saillan
Douglas Meiklejohn
Eric Jantz
New Mexico Environmental Law Center
Santa Fe, New Mexico

*Attorneys for the Plaintiffs*

John Cane
Shari Howard
  Environmental Defense Section
United States Department of Justice
Washington, D.C.

*Attorneys for the Defendant*